**UNITED STATES of America, Government,**

v.

**Robert N. ANGLETON, Defendant.**

**Criminal No. H–02–0040.**

United States District Court, S.D. Texas, Houston Division.

July 19, 2002.

---

---

Edward R. Gallagher, Terry Clark, James L. Turner, U.S. Attorneys Office, Houston, TX, U.S. Marshal–H, U.S. Probation,–H, Pretrial Services–H, Houston, TX, Financial Litigation, U.S. Attorneys Office, Southern District of Texas, Houston, TX, for Government.

Michael Wayne Ramsey, Houston, TX, for defendant.

## MEMORANDUM AND OPINION

ROSENTHAL, District Judge.

In 1997, a Texas grand jury indicted Robert N. Angleton for the capital murder of his wife, Doris Angleton. The indictment alleged that Angleton had promised to pay his brother to have Doris Angleton killed. In August 1998, a Texas state jury acquitted Robert Angleton of the capital murder charge. In January 2002, a federal grand jury indicted Robert Angleton under the federal murder for hire statute, alleging that he had promised to pay his brother to have Doris Angleton killed and caused his brother to travel in interstate commerce and use interstate facilities to accomplish the murder. Angleton has moved to dismiss this federal indictment on the basis of his prior trial and acquittal on the state capital murder charge. The question before this court is whether the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution bars this prosecution and requires the dismissal of the federal indictment.[1]

This court concludes that although the State of Texas would be foreclosed from reprosecuting Angleton for the murder of his wife, the dual sovereignty doctrine, which permits the federal and state governments to prosecute an individual for the same act if that act violates the laws of each government, defeats Angleton's motion to dismiss. Long-standing precedent affirming and applying the dual sovereignty doctrine leads this court to conclude that double jeopardy does not bar this federal prosecution. However, not all of Angleton's arguments are frivolous, as that term is defined in *United States v. Dunbar*, 611 F.2d 985 (5th Cir.1980), and *United States v. Kalish*, 690 F.2d 1144, 1147 (1982), or made for the sole purpose of delaying this federal trial. Based on the finding of nonfrivolousness, Angleton is entitled to an expedited interlocutory appeal under *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) and *Dunbar*, 611 F.2d 985, that will postpone the trial until a determination is made of the merits of the appeal.

The reasons for these rulings are explained in detail below.

---

1. Angleton has also moved to dismiss Count I of the indictment, charging him with conspiracy to commit murder for hire, on the ground that it violates "Wharton's Rule" as expressed in *Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). (Docket Entry No. 41). This opinion, however, only addresses the motion to dismiss based on double jeopardy.

## I. Background[2]

In April 1997, Doris Angleton was shot to death in her home in Houston, Texas. An extensive investigation followed. The primary investigators were Houston Police Department Homicide Detective Sergeants Jerry Novak and David Ferguson. Suspicion focused on Robert Angleton, from whom Doris Angleton was seeking a divorce. Robert Angleton was familiar to state and federal law enforcement officers as a professional bookmaker who cooperated with local and federal law enforcement agencies, working as an informant while continuing his illegal activities. The investigation led the police officers to suspect that Roger Angleton, Robert Angleton's brother, was involved in the murder. Roger Angleton had lived in San Diego, California. (Docket Entry No. 38, Ex. 6, Vol. 6, at 166). Police developed evidence showing that shortly before the murder of Doris Angleton, Roger Angleton used various aliases to register in different hotel rooms and rent two cars in Houston, Texas. (*Id.* at 151–169; Vol. 7, at 7–43). A few days after the murder, Roger Angleton abandoned a suitcase at an airport security checkpoint after two guns were detected. (*Id.* at 25–37; 60–62; 157–58).[3] Roger Angleton was later arrested in Las Vegas, Nevada on unrelated California warrants. (*Id.* at 129–151). Police also developed evidence that showed mail communications between Angleton and his brother shortly before and after the murder. (Docket Entry No. 64, Ex. 3, at 14, 18).

In the fall of 1997, following Roger Angleton's arrest in Las Vegas, Nevada, police arrested both brothers for Doris Angleton's murder. In October 1997, a Texas grand jury returned separate indictments against Roger Angleton and Robert Angleton for capital murder under section 19.03 of the Texas Penal Code. The Texas indictment against Robert Angleton alleged as follows:

> The duly organized Grand Jury of Harris County, presents in the District Court of Harris County, Texas, that in Harris County, Texas, ROBERT NICHOLAS ANGLETON, hereinafter styled the Defendant, on or about APRIL 16, 1997, did then and there unlawfully, intentionally, and knowingly cause the death of DORIS ANGLETON, hereafter styled the Complainant, by promising money to ROGER ANGLETON to cause the death of the Complainant for remuneration and the promise of remuneration.

(Docket Entry No. 38, Ex. 2).

Angleton and his brother were held without bond pending trial. In February 1997, Roger Angleton committed suicide in jail. He left behind a handwritten note indicating that he alone was responsible for Doris Angleton's murder.

The state trial of Robert Angleton began in July 1998. During the trial, HPD Detective Sergeants Novak and Ferguson testified and HPD Officer Jewel acted as the liaison between the police department and the Harris County District Attorney's Office. (Docket Entry No. 64, Ex. 3, at 27). During the trial, state prosecutors introduced at least one piece of evidence obtained by the Federal Bureau of Investigation, a surveillance tape from an unrelat-

---

**2.** The background facts recited are drawn from FBI Special Agent Cynthia Rosenthal's testimony at Angleton's arraignment, detention, and bond hearing; Angleton's statement of facts in his motion; and the documents made part of the record at the hearing, which include the federal indictment, the state indictment, the state jury verdict, the state jury instructions, the state trial transcript, the FBI interviews of the state jurors, and Angleton's Request for Pretrial Release previously considered by this court.

**3.** These guns were not the same caliber as the guns used to murder Doris Angleton.

ed investigation containing Angleton's voice.[4] On August 12, 1998, the jury acquitted Angleton of the capital murder for hire charge. (Docket Entry No. 38, Ex. 3). Angleton's acquittal was the first acquittal in a capital murder case tried in Harris County since the death penalty was reinstated in 1976. (Docket Entry No. 64, Ex. 3, at 34).

Approximately six months after the acquittal, FBI Special Agent Cynthia Rosenthal and another FBI agent began investigating Angleton for violations of federal law, including money laundering and RICO violations relating to his gambling and bookmaking activities and income tax evasion. (*Id.* at 11, 26). This investigation did not include the murder of Doris Angleton. State officials cooperated with this federal investigation. (*Id.* at 26). At some later date, the Harris County District Attorney's Office asked the United States Attorney's Office to investigate Angleton for murder for hire under federal law. (*Id.* at 28). In April 2000, the United States Attorney's Office asked the FBI to expand its investigation of Robert Angleton's activities to include his role in the murder of his wife. (*Id.*). An *ad hoc*, undocumented joint task force of federal and state officials, consisting of Special Agent Cynthia Rosenthal, other FBI agents, HPD Sergeants Novak and Ferguson, and HPD Officer Jewel, was formed.

(*Id.* at 27–28).[5] Sergeants Novak and Ferguson were the primary case agents who originally investigated Doris Angleton's murder and testified in Angleton's state trial; officer Jewel was the liaison between the HPD and the state prosecutors. (*Id.*; Docket Entry No. 38, Ex. 6, Vol. 1, at 5–6). The three HPD members of the joint task force were deputized as United States Deputy Marshals so that they could access FBI files. (Docket Entry No. 64, Ex. 3, at 45–46). The HPD continued to pay their salaries. (*Id.*). The joint task force received all the information the HPD had gathered for use in the state prosecution. (*Id.* at 28). The two assistant district attorneys who prosecuted Angleton in the state trial, who are personal friends of FBI Special Agent Rosenthal, also cooperated with and encouraged the federal/state joint task force. (*Id.* at 35). As part of the investigation, FBI agents interviewed members of the jury that had acquitted Angleton.[6] Angleton's counsel have been allowed to review and summarize the FBI reports of these interviews. From these summaries, it appears that the questioning focused on how various pieces of evidence and other trial strategies impacted the jurors' decision to vote not guilty. (Docket Entry No. 64, Ex. 1). The parties agree that the federal prosecution will rely on much of the same evidence as the state prosecution.[7]

4.  This tape was obtained from previous investigations involving Angleton in his role as an informant for the Houston Police Department and the FBI relating to his bookmaking and gambling activities.

5.  The involvement of the Houston Police Department and the Harris County District Attorney's office in the federal investigation and indictment was detailed by FBI Special Agent Cynthia Rosenthal in her testimony at Angleton's arraignment.

6.  The defense presented its summary of the FBI reports at the hearing. The government objected to this document, not on the basis of

reliability, but rather on the basis that the summaries are not relevant to the issues now before this court. The fact that the FBI interviewed the state court jurors is relevant to the issue of collusion between the state and federal prosecutions, which Angleton asserts bars this prosecution under *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959) and its progeny. The summary is admissible for this limited purpose.

7.  The joint task force has received one piece of new evidence, a tape recording of an interview Angleton gave to a writer, Vanessa Leggett, and has continued to develop previously available evidence, including an enhanced

No federal indictment was returned alleging that Angleton had violated RICO or committed money laundering or income tax evasion, charges that the federal agents had first investigated. In January 2002, a federal grand jury returned a three-count indictment against Angleton, based on the 1997 murder of Doris Angleton. Count One of the indictment charges Angleton with conspiring to commit murder for hire, in violation of 18 U.S.C. § 1958.[8] It states:

> From an unknown date believed to be in January, 1997, in the Southern District and Northern Districts of Texas and the State of California, the defendant, did knowingly and willfully combine, conspire, confederate and agree with Roger Angleton, not indicted herein, to cause another to travel in interstate commerce and use a facility in interstate commerce with intent that the murder of Doris Angleton be committed in violation of the laws of the State of Texas and the United States, as consideration for the receipt of, and as consideration for a promise and agreement to pay, a thing of pecuniary value, that is, United States Currency, such conduct resulting in the death of Doris Angleton.

(Docket Entry No. 38, Ex. 1). The indictment then alleges the methods, means, and overt acts of the conspiracy, including that Robert Angleton agreed to pay Roger An-gleton to have Doris Angleton murdered; that Roger Angleton traveled from California to Texas to prepare for the killing; that Roger Angleton shot Doris Angleton in Houston, then left the city; and that the plan included Robert Angleton's agreement to pay Roger Angleton even if he was captured and Roger Angleton's agreement to take the full blame and attempt to exonerate his brother if he was captured.

Count Two of the indictment charges Robert Angleton with committing murder for hire, in violation of 18 U.S.C. § 1958. Count Two states:

> From an unknown date, believed to be in January of 1997, and continuing until April 16, 1997, in the Southern District of Texas, the defendant, Robert Nicholas Angleton, aided and abetted by Roger Angleton, not indicted herein, did cause another to travel in interstate commerce and did use a facility of interstate commerce with intent that the murder of Doris Angleton be committed in violation of the laws of the State of Texas and the United States, as consideration for the receipt of, and as consideration for a promise and agreement to pay, a thing of pecuniary value, that is, United States Currency, such conduct resulting in the death of Doris Angleton. (Id.).[9]

Count Three of the indictment charges Angleton with using a firearm in connec-

---

tape recording that was a focus of the state trial.

8. Section 1958(a) provides, in relevant part:

Whoever travels in or causes another ... to travel in interstate or foreign commerce, or uses or causes another ... to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State ... as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, ... and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.

9. Counts One and Two additionally charge violations of 18 U.S.C. § 2, the aiding and abetting statute. That statute defines which actors may be charged for violating other substantive criminal statutes and cannot alone be violated. *See United States v. Sorrells*, 145 F.3d 744, 752 (5th Cir.1998) (18 U.S.C. § 2 "does not define a separate crime, but rather provides another means of convicting someone of the underlying offense.") (internal quotations and citations omitted).

tion with a crime of violence, in violation of 18 U.S.C. § 924(c)(1).[10] Count Three states:

> On or about April 16, 1997, in the Southern District of Texas, the defendant, Robert Nicholas Angleton, aided and abetted by Roger Angleton, not indicted herein, did knowingly use and carry a firearm during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, as alleged in Counts One and Two of this Indictment.

(*Id.*).

Angleton challenges the federal indictment under the Double Jeopardy Clause on several grounds. First, Angleton argues that the nature and extent of the state officials' involvement in Angleton's federal indictment and prosecution amounts to collusion between the state and federal governments that triggers the "sham prosecution" exception to the dual sovereignty doctrine. Second, he contends that because the federal murder for hire statute, 18 U.S.C. § 1958, incorporates the Texas capital murder statute, there is no separate federal basis for this prosecution. Angleton relies on the pre-Civil War case of *Houston v. Moore*, 18 U.S. (5 Wheat.) 1, 5 L.Ed. 19 (1820), for the argument that the incorporation of the state statute into the federal statute bars the successive federal prosecution as derivative of the failed state effort. Third, Angleton argues that collateral estoppel applies to bar this pros-

ecution because at least one essential fact as to each count in the federal indictment was necessarily determined in the former trial. Fourth, Angleton argues that to apply 18 U.S.C. § 1958 to make a federal case out of what has historically been a state law crime, that has already been tried in a state court, raises serious constitutional issues of due process, federalism, and the limits on Congress's power under the Commerce Clause. Angleton argues that this court should avoid these constitutional issues by adopting a narrow interpretation of 18 U.S.C. § 1958 and require a showing of a compelling federal interest in this successive federal prosecution. Angleton argues that no such interest can be demonstrated.

Angleton urges that these grounds require the dismissal of this indictment. At a minimum, Angleton contends that the arguments he raises are colorable and, therefore, not frivolous, permitting him an interlocutory appeal that divests this court of jurisdiction to proceed with his trial until the appeal is decided.

The government's primary response is that under binding Supreme Court and Fifth Circuit case law, the dual sovereignty doctrine applies to permit the federal government, a separate sovereign from the State of Texas, to prosecute Angleton for the separate, federal offense that arose from the use of interstate facilities and travel to commit the murder for hire of his wife. The government asserts that the

---

10. Section 924(c)(1) provides, in relevant part:

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prose-

cuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—(i) be sentenced to a term of imprisonment of not less than 5 years; (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

degree of federal and state cooperation in obtaining this successive indictment is well within the limits of the dual sovereignty doctrine and far less than courts have required to trigger any sham prosecution exception to that doctrine. The government contends that under well-established law, murder for hire is a federal crime when its perpetration involves the use of interstate travel or facilities in interstate commerce, and that this indictment does not strain constitutional limits. Finally, the government argues that the law is so clear that Angleton's challenges should be deemed frivolous, so that this court retains jurisdiction to proceed with his trial during any interlocutory appeal.

In accordance with *United States v. Stricklin*, 591 F.2d 1112, 1117–18 (5th Cir. 1979), this court held a pretrial hearing to provide Angleton an opportunity to present evidence in support of a *prima facie* case of double jeopardy. (Docket Entry No. 63); *see United States v. Patterson*, 809 F.2d 244, 247 (5th Cir.1987). Angleton has submitted the federal indictment (Docket Entry No. 38, Ex. 1); the state indictment (*Id.*, Ex. 2); the state jury verdict and judgment (*Id.*, Ex. 3); a copy of Texas Penal Code §§ 19.02–.03 (*Id.*, Ex. 4); the state jury instructions (*Id.*, Ex. 5); the transcript of the state trial (*Id.*, Ex. 6); defense counsel's summaries of the FBI interviews of the state jurors and alternates (Docket Entry No. 64, Ex. 1); Angleton's Request for Pretrial Release (*Id.*, Ex. 2); and the transcript of Angleton's Arraignment, Detention and Bond Hearing containing the testimony of FBI Special Agent Rosenthal, who was in charge of the joint task force investigation (*Id.*, Ex. 3). Both the government and Angleton presented oral argument and both have filed extensive briefs.

Each of Angleton's arguments, and the government's response, is addressed below.

## II. The Law of Double Jeopardy

### A. Procedural Rules Governing Double Jeopardy Claims

The Fifth Circuit has established procedures for district courts to apply in analyzing double jeopardy claims raised before trial. In *Stricklin*, 591 F.2d 1112, the Fifth Circuit addressed a double jeopardy claim arising from three federal court indictments for drug trafficking conspiracies. The Fifth Circuit held that a defendant bears the burden of establishing a *"prima facie* nonfrivolous double jeopardy claim." *Id.* at 1117–18. Once a defendant has "made a nonfrivolous showing that an indictment charges the same offense as that for which he was formerly placed in jeopardy," the burden of persuasion shifts to the government to prove by a preponderance of the evidence that two separate crimes are charged. *Id.* To make the *prima facie* showing of double jeopardy, the defendant may refer to the indictments, his own testimony at the pretrial hearing, or by presenting other evidence normally available at the pretrial stage. *Id.* The government may then respond with sufficient evidence to demonstrate by a preponderance of the evidence that two separate crimes are charged. The procedure for addressing double jeopardy claims "in no way alters the discovery now available to defendants." *Id.* at 1118.

*Stricklin* did not involve successive prosecutions by different sovereigns. The only issue in *Stricklin* was whether the indictments charged the same offense under the standards of *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *See United States v. Sharpe*, 193 F.3d 852, 863 (5th Cir.1999) (citing *United States v. Dixon*, 509 U.S. 688, 697, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993)). In the Supreme Court's most recent case on the dual sovereignty doctrine in the context of a double jeopardy claim, *Heath v.*

*Alabama,* 474 U.S. 82, 87, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985), the Court first analyzed whether the two offenses charged were the "same" for double jeopardy purposes. The Court then turned to determining whether the "two entities that seek successively to prosecute the defendant for the same course of conduct can be termed separate sovereigns." *Id.* at 88, 106 S.Ct. 433. Fifth Circuit cases considering double jeopardy claims involving two sovereigns have followed this approach. *See United States v. Cooper,* 949 F.2d 737, 750–51 (5th Cir.1991); *United States v. Moore,* 958 F.2d 646, 650 (5th Cir.1992).

To establish a *prima facie* claim of double jeopardy, Angleton must first show that the offenses charged in the state and federal indictments are the "same offense" under the *Blockburger* test. If the offenses are the "same" for the purpose of double jeopardy, the government must show that the dual sovereignty doctrine applies. Angleton contends that this court should apply the sham prosecution exception to the dual sovereignty doctrine; he must make a *prima facie* showing that the federal prosecution was a mere tool of the state prosecution. *Cooper,* 949 F.2d at 750–51; *Patterson,* 809 F.2d at 247. If he makes such a showing, the burden shifts to the government.

The threshold issue is whether the federal indictment charges the same offenses that were the basis of Angleton's state trial and acquittal.

## B. The *Blockburger* Analysis

■ The Fifth Amendment to the United States Constitution commands that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. A subsequent prosecution avoids double jeopardy if the charged offenses are not the same. The government contends that under the test established in *Blockburger v. United*

*States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), this federal indictment does not charge the same offense because the offenses alleged in counts one through three do not contain the same elements as the Texas capital murder statute under which Angleton was acquitted. Angleton asserts that, under the *Blockburger* test, Counts One and Two of the federal indictment are the "same offense" as the capital murder charge contained in the state indictment. In addition, Angleton asserts that Counts One and Two are, as compared to each other, the "same offense" and, thus, he cannot be charged with both conspiracy to commit murder for hire and the commission of murder for hire under 18 U.S.C. § 1958. As for Count Three, Angleton argues that the count fails if double jeopardy bars Counts One and Two because Count Three can proceed only if the alleged underlying crime is an offense for which the defendant "may be prosecuted in a court of the United States." 18 U.S.C § 924(c)(1)(A). The government does not contest Angleton's analysis of Count Three.

■ "Under the *Blockburger* test, each offense must contain an element not contained in the other; if not, they are the same offense within the Clause's meaning and double jeopardy bars subsequent punishment or prosecution." *Sharpe,* 193 F.3d at 863 (citing *Dixon,* 509 U.S. at 697, 113 S.Ct. 2849); *see also Texas v. Cobb,* 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001) (applying the *Blockburger* test to determine whether two offenses are the same); *United States v. Avants,* 278 F.3d 510, 516 (5th Cir.2002) (same). The *Blockburger* test focuses on the elements of the charged offense rather than the evidence presented at trial. *Illinois v. Vitale,* 447 U.S. 410, 413–15, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980).

■ Angleton is charged with both conspiracy to commit murder for hire and committing murder for hire. The elements of commission of murder for hire resulting in death are: 1) travel in or causing another to travel in interstate commerce, or using or causing another to use the mail or any facility in interstate or foreign commerce; with 2) intent that a murder be committed in violation of the laws of Texas;[11] 3) as consideration for a promise or agreement to pay anything of pecuniary value; 4) resulting in a death. The elements of conspiracy to commit murder for hire are identical, with the addition of the element of conspiring with another. (Docket Entry No. 38, Ex. 1). Conspiracy and the substantive offense that is the object of the conspiracy are separate and distinct crimes. *See, e.g.,* *United States v. Hernandez,* 141 F.3d 1042 (11th Cir.1998); *United States v. Romeros,* 600 F.2d 1104, 1105 (5th Cir.1979) (citing *Iannelli v. United States,* 420 U.S. 770, 777–778, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975); *United States v. Ragano,* 520 F.2d 1191, 1198 (5th Cir.1975)). Charging Angleton with conspiracy to commit murder for hire and the substantive offense of murder for hire under 18 U.S.C. § 1958 does not violate the Double Jeopardy Clause.

Angleton was indicted for, and acquitted of, the offense of capital murder under Texas Penal Code § 19.03(a)(3). Angleton argues that conspiracy to commit murder for hire and the commission of murder for hire under section 1958 are the same offense as capital murder for remuneration under Texas law because there is no additional element in the state offense that is not contained in the two federal offenses separately.[12]

■ The elements of the offense charged in the state indictment are: 1) intentionally or knowingly; 2) causing death; 3) by employing another to commit the murder for remuneration or the promise of remuneration. (Docket Entry No. 38, Ex. 2). Both the state and federal offenses require: 1) intent; 2) death; and 3) commission of the murder for remuneration. The federal offenses each require proof of additional elements—a conspiracy and interstate travel—but the state murder charge does not. The government argues that the state charge of murder for remuneration requires proof that a death occurred, which is not an element under section 1958. However, if, as here, a death occurred, section 1958 provides for an enhanced maximum penalty of life imprisonment or death, which increases the statutory punishment. The fact that a death occurred must be pleaded in the indictment, submitted to the jury, and found beyond a reasonable doubt. *See Apprendi v. New Jersey,* 530 U.S. 466, 476, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *Ring v. Arizona,* 536 U.S. ——, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). There is no additional

**11.** The indictment charges intent to commit a murder "in violation of the laws of the State of Texas and the United States." (Docket Entry No. 38, Ex. 1). The government concedes, however, that there is no general federal murder statute and no other applicable federal murder statute. (Docket Entry No. 51, at 30).

**12.** Section 19.03(a)(3) provides:
(a) A person commits an offense if he commits murder as defined under Section 19.02(b)(1) and:

. . .
(3) the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration;
. . . .
Texas Penal Code § 19.02(b)(1) provides:
(b) A person commits an offense if he:
(1) intentionally or knowingly causes the death of an individual;
. . . .

element in the state charge against Angleton that is not contained in the first two counts of the federal indictment.

■ The offenses charged in Counts One and Two of the indictment are, for *Blockburger* purposes, the same offense as the Texas capital murder charge for which Angleton was tried and acquitted. *See, e.g., United States v. Basile,* 109 F.3d 1304, 1306–07 (8th Cir.), *cert. denied,* 522 U.S. 873, 118 S.Ct. 189, 139 L.Ed.2d 128, *cert. denied sub nom., DeCaro v. United States,* 522 U.S. 866, 118 S.Ct. 173, 139 L.Ed.2d 115 (1997) (assuming that federal murder for hire indictment charged same offense as state murder charges arising from same conduct and applying dual sovereignty doctrine).

If the dual sovereignty doctrine applies, double jeopardy does not prevent the federal government from prosecuting Angleton for the same offense. *See Abbate v. United States,* 359 U.S. 187, 196, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); *United States v. McKinney,* 53 F.3d 664, 676 (5th Cir. 1995). Angleton argues that the dual sovereignty doctrine does not apply based on exceptions to the doctrine recognized in *Bartkus v. Illinois,* 359 U.S. 121, 123, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959), and *Houston v. Moore,* 18 U.S. (5 Wheat.) 1, 5 L.Ed. 19 (1820). Alternatively, he urges that the underpinnings of the doctrine have been so eroded that it should be reexamined and its application to these facts rejected.

### C. The Dual Sovereignty Doctrine

■ Even if two offenses contain the same elements, "successive prosecutions by separate sovereigns for crimes arising out of the same acts are not barred" by double jeopardy. *United States v. Johnson,* 91 F.3d 695, 697 (5th Cir.1996) (applying dual sovereignty doctrine to allegations of prosecutorial vindictiveness). The dual sovereignty doctrine rests on the notion that a defendant whose conduct violates the laws of two sovereigns has "committed two different offenses by the same act, and [thus] a conviction by a court [of one sovereign] of the offense against that [sovereign] is not a conviction of the different offense against the [other sovereign] and so is not double jeopardy." *United States v. Lanza,* 260 U.S. 377, 382, 43 S.Ct. 141, 67 L.Ed. 314 (1922).

The United States Supreme Court first used the dual sovereignty concept in *Lanza* to uphold a federal prosecution after a state prosecution for the same offense. However, the Court had discussed the doctrine in two pre-Civil War cases, *Fox v. Ohio,* 46 U.S (5 How.) 410, 12 L.Ed. 213 (1847), and *Moore v. Illinois,* 55 U.S (14 How.) 13, 14 L.Ed. 306 (1852). In *Fox,* the Court considered a challenge to the constitutionality of a state statute criminalizing the use of counterfeit United States currency. The defendant argued that the state statute was unconstitutional because only Congress had jurisdiction to criminalize the conduct in question. In support of this argument, the defendant contended that allowing a state to criminalize the use of counterfeit United States currency could result in a violation of the Fifth Amendment because a state and the federal government might punish an individual for the same illegal act. The Court rejected this concern, noting that under *Barron v. City of Baltimore,* 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833), the Bill of Rights, including the Fifth Amendment, was a restriction only on the federal government, not on the power of the state governments. *Id.* 46 U.S. at 434. Responding to the argument that successive punishment could be imposed for the same conduct, the Court stated:

> It is almost certain, that, in the benignant spirit in which the institutions both of the State and Federal systems are administered, an offender who should have suffered the penalties denounced

by the one would not be subjected a second time to punishment by the other for acts essentially the same, unless indeed this might occur in instances of peculiar enormity, or where the public safety demanded extraordinary rigor.

*Id.* at 435. Justice McLean dissented, arguing that the majority's result established a great defect in our system. For the punishment under the State law would be no bar to a prosecution under the law of Congress. And to punish the same act by the two governments would violate, not only the common principles of humanity, but would be repugnant to the nature of both governments. If there were a concurrent power in both governments to punish the same act, a conviction under the laws of either could be pleaded in bar to a prosecution by the other. But it is not pretended that the conviction of Malinda Fox, under the State law, is a bar to a prosecution under the law of Congress. Each government, in prescribing the punishment, was governed by the nature of the offense, and must be supposed to have acted in reference to its own sovereignty. There is no principle better established by the common law, none more fully recognized in the federal and State constitutions, than that an individual shall not be put in jeopardy twice for the same offense. This, it is true, applies to the respective governments; but its spirit applies with equal force against a double punishment, for the same act, by a State and a federal government.

*Id.* at 439.

In *Moore v. Illinois*, 55 U.S. at 17, the Court considered the constitutionality of an Illinois statute criminalizing "harboring or secreting a negro slave." *Id.* The defendant argued that the statute was unconstitutional because it conflicted with the constitutional provision and act of Congress on the same subject. The defendant also argued that the Illinois statute was void because it could subject "the delinquent to a double punishment for a single offense." *Id.* at 19. The Court rejected this argument, stating the now classic expression of the dual sovereignty doctrine:

Every citizen of the United States is also a citizen of a State or territory. He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either. The same act may be an offense or transgression of the laws of both. . . . That either or both may (if they see fit) punish such an offender, cannot be doubted. Yet it cannot be truly averred that the offender has been twice punished for the same offenses; but only by one act he has committed two offenses, for each of which he is justly punishable.

*Id.* at 20. Justice McLean again dissented, arguing that the federal statute should be held to preempt state statutes criminalizing the same conduct in order to avoid a result so "contrary to the nature and genius of our government" as "to punish an individual twice for the same offense." *Id.* at 21–22.

In *Lanza*, decided in 1922, the Court upheld a federal prosecution after the state had convicted the defendant for the same offense. 260 U.S. 377, 43 S.Ct. 141. The federal government indicted the defendant under the National Prohibition Act, 41 Stat. 305 (1921), legislation Congress enacted in 1919 to enforce the Eighteenth Amendment. The defendant had previously been convicted for violating a state law that proscribed the manufacture, transport, or possession of liquor. The district court dismissed the federal indictment. The argument before the Supreme Court centered on the provision of the Eighteenth Amendment to the United States Constitution that gave state and federal governments concurrent power to enforce prohibition. U.S. CONST. amend.

18, § 2. The defendant argued that both the state law under which he had been convicted and the federal statute under which he was subsequently indicted derived from the same source, the second section of the Eighteenth Amendment, making a prosecution by the state "in principle" a prosecution by the United States in its courts. *Id.* at 379–80, 43 S.Ct. 141. The Supreme Court rejected the argument, holding that the Double Jeopardy Clause did not bar the federal government from prosecuting an individual for the same offense for which he had been tried previously in a state court. The Court's language was broad:

> Each government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other.
>
> . . . .
>
> It follows that an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each. The Fifth Amendment, like all the other guaranties in the first eight amendments, applies only to proceedings by the federal government ... and the double jeopardy therein forbidden is a second prosecution under authority of the federal government after a first trial for the same offense under the same authority. Here the same act was an offense against the state of Washington, because a violation of its law, and also an offense against the United States under the National Prohibition Act. The defendants thus committed two different offenses by the same act, and a conviction by a court of Washington of the offense against that state is not a conviction of the different offense against the United States, and so is not double jeopardy.

*Id.* at 382, 43 S.Ct. 141.

The Court did not limit its language to cases arising under the Eighteenth Amendment, which established an area of concurrent state and national power. Instead, the Court endorsed in broad terms the dual sovereignty doctrine that had been articulated in *Fox v. Ohio* and *Moore v. Illinois*, describing these cases as a "long line of decisions" supporting a view of the Fifth Amendment that permitted successive prosecutions for the same conduct. The Court explained why it believed its decision to be sound:

> If a state were to punish the manufacture, transportation and sale of intoxicating liquor by small or nominal fines, the race of offenders to the courts of that state to plead guilty and secure immunity from federal prosecution for such acts would not make for respect for the federal statute or for its deterrent effect.

*Id.* 43 S.Ct. at 143.

In 1959, the Supreme Court decided *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959), holding that the Fourteenth Amendment did not bar a state from prosecuting the defendant after the federal government had already tried him for the same offense. On the same day, the Court decided *Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959), holding that the Fifth Amendment did not bar the federal government from prosecuting two individuals for the same offense for which they had previously been tried in state court. Both decisions issued on a vote of five to four. Both cases rested in part on the fact that the Double Jeopardy Clause was considered inapplicable to the states, *Bartkus*, 359 U.S. at 123–39, 79 S.Ct. 676; *Abbate*, 359 U.S. at 198–96, 79 S.Ct. 666, a position changed when the Court decided *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). In both cases, Justice Black dissented, vigorously arguing "that a federal trial following a state acquittal or conviction is barred by the Double Jeopar-

dy Clause of the Fifth Amendment" and that a state conviction following a federal prosecution "cannot stand. For I think double prosecutions for the same offense are so contrary to the spirit of our free country that they violate even the prevailing view of the Fourteenth Amendment. . . ." *Bartkus*, at 150–51, 79 S.Ct. 676.

In *Bartkus*, the defendant was indicted, tried, and acquitted in federal court on charges that he had robbed a federally insured savings and loan association located in Illinois. Three weeks later, an Illinois state grand jury indicted the defendant for the same acts, charging him with violating a state robbery statute. The Supreme Court affirmed the second, state prosecution under the Due Process Clause of the Fourteenth Amendment, relying on the inapplicability of the Double Jeopardy Clause to the states and on what the majority described as a "long, unbroken, unquestioned course of impressive adjudication" before and since *Lanza* permitting a "second prosecution where the first was by a different government and for violation of a different statute." 359 U.S. at 135, 79 S.Ct. 676. The majority echoed the themes sounded in *Lanza*: the theoretical basis of the doctrine of dual sovereignty, that the same conduct may violate the law of separate sovereigns and be subject to separate punishment, and the practical concern that if a successive prosecution was barred in all cases a defendant would

seek immunization from significant punishment by manipulating the system to ensure that the first prosecution was in the jurisdiction that imposed a much less severe sanction. In the context of a successive state prosecution, such a result would "be in derogation of our federal system" because it would allow the "federal prosecution of a comparatively minor offense to prevent state prosecution of [a] grave . . . infraction of state law." *Id.* at 137, 79 S.Ct. 676.

In his dissent, Justice Black criticized the majority's characterization of the precedents, noting that "[d]espite its exhaustive research, the Court has cited only three cases before *Lanza* where a new trial after an acquittal was upheld." *Id.* at 161, 79 S.Ct. 676.[13] Only one of these cases, a 1915 decision from the State of Washington, clearly allowed a reprosecution and conviction following an acquittal for the same offense. *Id.* (citing *State v. Kenney*, 83 Wash. 441, 145 P. 450 (1915)). As to the cases decided after *Lanza*, the majority cited one state case decided in 1943 and four federal cases decided in the 1950s, allowing successive prosecutions. *Id.* at 163 n. 33, 79 S.Ct. 676. It is on this "meager basis," as contrasted with historical opposition to the practice of double prosecutions, that the Court rested its finding that Bartkus's retrial did not violate the "fundamental principles 'rooted in the traditions and conscience of our peoples.'" *Id.* at 162, 79 S.Ct. 676.[14]

---

**13.** Justice Brennan also dissented in *Bartkus*. His dissent dealt primarily with the "sham prosecution" exception and is discussed below.

**14.** Academic commentators have also found fault with Justice Frankfurter's characterization of the record of authority supporting successive prosecutions by state and federal courts. "The existing body of precedent did not present the 'irrefutable evidence' he described. The course of adjudication was not 'long,' 'unbroken,' or 'unquestioned'; frankly,

it was not that 'impressive.'" Daniel Braun, *Praying to False Sovereigns: The Rule Permitting Successive Prosecutions in the Age of Cooperative Federalism*, 20 Am J.Crim.L. 1 (1992); *see also* Akhil Reed Amar & Jonathan L. Marcus, *Double Jeopardy Law After Rodney King*, 95 Colum.L.Rev. 1 (1995); Sandra Guerra, *The Myth of Dual Sovereignty: Multijurisdictional Drug Law Enforcement and Double Jeopardy*, 73 N.C.L.Rev. 1159 (1995). However, commentators have also recognized that despite these criticisms, "candor requires acknowledgment that, in 1922, the most obvious

Justice Black made his own point as to the practical impact of the dual sovereignty doctrine:

> The Court apparently takes the position that a second trial for the same act is somehow less offensive if one of the trials is conducted by the Federal Government and the other by a State. Looked at from the standpoint of the individual who is being prosecuted, this notion is too subtle for me to grasp. If double punishment is what is feared, it hurts no less for two "Sovereigns" to inflict it than for one. If danger to the innocent is emphasized, that danger is surely no less when the power of State and Federal Governments is brought to bear on one man in two trials, then when one of these "Sovereigns" proceeds alone. In each case, inescapably, a man is forced to face danger twice for the same conduct.

*Id.* at 155, 79 S.Ct. 676. Justice Black rejected the argument that effective law enforcement required the opportunity for "double prosecutions" by the states and federal government. If Congress believed that the states were subverting federal laws by imposing inadequate penalties, Congress could preempt the states' involvement or set minimum penalties to protect federal interests. *Id.* at 157, 79 S.Ct. 676.[15]

In *Abbate*, the defendants pleaded guilty to violating an Illinois statute criminalizing conspiracy to injure or destroy the property of another. 359 U.S. at 187, 79 S.Ct. 666. The pleas arose from an aborted plan to dynamite communications facilities during a union strike against the communications company. Defendants received three month state prison terms. Early the next year, a federal grand jury indicted defendants for conspiracy to injure or destroy a means of communication operated or controlled by the United States, based on the fact that the targeted facilities carried cables used by federal agencies. *Id.* at 188–89, 79 S.Ct. 666. Because this case involved a successive federal prosecution, the Court confronted the Fifth Amendment Double Jeopardy Clause. The Court briefly reviewed the dual sovereignty doctrine jurisprudence, concluding that *Lanza* had been correctly decided. The Court again emphasized the practical concern that overruling *Lanza* would hinder federal law enforcement unless the federal government displaced state power to prosecute crimes based on acts that also violated federal law. "This would bring about a marked change in the distribution of powers to administer criminal justice, for the States under our federal system have the principal responsibility for defining and prosecuting crimes." *Id.* at 195, 79 S.Ct. 666. Justice Black again dissented, noting that *Lanza* itself relied on *dicta* in *Fox v. Ohio* and *Moore v. Illinois*. Justice Black remained unconvinced "that a State and the Nation can be considered two wholly separate sovereignties for the purpose of allowing them to do together what, generally, neither of them can do separately." *Id.* at 203, 79 S.Ct. 666.

In response to *Bartkus*, the Department of Justice implemented the so-called *Petite*

---

of the existing precedents supported successive prosecutions." Kenneth M. Murchison, *The Dual Sovereignty Exception to Double Jeopardy*, 14 N.Y.U.Rev.L. & Soc. Change 383, 402 (1986), *quoted in* Braun, *Praying to False Sovereigns*, at 10.

**15.** Justice Black argued that *Lanza* could be limited to the unusual context of Prohibition in which the case arose: the specific creation in the Eighteenth Amendment of an "area of concurrent state and national power where the Federal Government was not supreme." *Id.*, 157 n. 16. However, the *Lanza* opinion is not so narrowly drafted, and *Bartkus* and *Abbate* did not read it narrowly.

policy, first recognized by the courts in *Petite v. United States*, 361 U.S. 529, 531, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960) (per curiam). The policy "precludes the initiation or continuation of a federal prosecution, following a prior state or federal prosecution based on substantially the same acts or transactions" unless the prior prosecution has left a "substantial interest ... demonstrably unvindicated." 3 DEPT. OF JUSTICE MANUAL tit. 9–2.031(A) (2d ed.2002–1 Supp.).

The Supreme Court's most recent case applying the dual sovereignty doctrine in the context of double jeopardy is *Heath v. Alabama*, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985). In that case, the defendant hired two individuals to murder his wife. *Id.* at 83–84, 106 S.Ct. 433. The wife was kidnaped from their residence in Alabama. Her body was later found in an abandoned car in Georgia. Georgia and Alabama conducted dual investigations into the kidnaping and murder, with some cooperation. A Georgia grand jury indicted Heath for "malice" murder under Georgia law. Heath pleaded guilty to the murder in exchange for a life sentence. *Id.* at 84, 106 S.Ct. 433. A few months later, a grand jury in Alabama indicted Heath for the capital offense of murder during a kidnaping. Heath was convicted and sentenced to death. Heath argued that his Georgia conviction barred the subsequent Alabama conviction for charges based on the same conduct. The issue was whether the dual sovereignty doctrine permitted a second state to prosecute for the same offense when double jeopardy would have prevented the first state from doing so. *Id.* at 88, 106 S.Ct. 433. The Court concluded that because the states are presumptively separate sovereigns, Heath's prosecution by each in succession did not constitute double jeopardy. *Id.* at 89–93, 106 S.Ct. 433.

*Heath*, decided in 1985, applied the dual sovereignty doctrine to successive prosecutions by two states. The Supreme Court has not considered a case involving successive state and federal prosecutions for the same offense since deciding *Bartkus* and *Abbate* in 1959. Angleton urges that specific developments justify a reexamination of the dual sovereignty doctrine. After *Lanza*, *Bartkus*, and *Abbate* were decided, the Supreme Court held that the Double Jeopardy Clause of the Fifth Amendment is applicable to the states. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). However, the Court has not examined the impact of this holding on the dual sovereignty doctrine articulated in the earlier cases. The Court's silence is in contrast to its approach to the dual sovereignty doctrine in cases decided under the Fourth Amendment and the Self–Incrimination Clause of the Fifth Amendment after they were held to apply to the states.

In *Elkins v. United States*, 364 U.S. 206, 215, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), decided after the Court recognized that the Fourth Amendment applied to the states, the Court discarded the "silver platter doctrine," under which evidence obtained by state officials through unreasonable searches or seizures could be introduced as evidence in a federal criminal trial. In support of its holding, the Court echoed Justice Black's dissents in *Bartkus* and *Abbate*: "To the victim it matters not whether his constitutional right has been invaded by a federal agent or by a state officer." *Id.* at 215, 80 S.Ct. 1437. Justice Harlan dissented, arguing that the Court's decision abandoned "sound constitutional doctrine under our federal scheme of things, doctrine which only as recently as last Term was reiterated by this Court. *See Abbate v. United States ... Bartkus v. Illinois ....* " *Id.* at 252, 80 S.Ct. 1437. In *Murphy v. Waterfront Commission of*

*New York Harbor,* 378 U.S. 52, 77–78, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), decided after the recognition that the Self–Incrimination Clause applied to the states, the Court overruled previous decisions under which a state or the federal government could compel a witness to give testimony which might incriminate the witness in the other sovereign's courts. In overruling this precedent, the Court discarded the " 'separate sovereignty' theory of self-incrimination." *Id.* at 89, 84 S.Ct. 1594 (Harlan, J., concurring). The Court reasoned that the policies behind the privilege would be frustrated by the dual sovereignty doctrine, which allowed a defendant to be " 'whipsawed into incriminating himself under both state and federal law even though' the constitutional privilege against self-incrimination applied to each." *Id.* at 55, 84 S.Ct. 1594 (quoting *Knapp v. Schweitzer,* 357 U.S. 371, 385, 78 S.Ct. 1302, 2 L.Ed.2d 1393 (1958) (Black, J., dissenting)). This problem, the Court noted, was especially significant "in our age of 'cooperative federalism,' where the Federal and State Governments are waging a united front against many types of criminal activity." *Id.* By contrast, despite the decision in *Benton v. Maryland,* applying the Double Jeopardy Clause to the states, the Supreme Court has not examined whether the dual sovereignty doctrine applied in *Bartkus* and *Abbate* should be reexamined.

The increase in the scope of federal criminal law, a "dramatic change[] that ha[s] occurred in the relationship between the federal government and the states since the time of *Bartkus* and *Abbate,*" has greatly expanded the likelihood of successive prosecutions. The successive prosecutions permitted under the dual sovereignty doctrine in *Bartkus, Abbate,* and *Heath* stand in tension with the Court's recognition in cases such as *Green v. United States,* that a government may not repeatedly prosecute an individual, "thereby subjecting him to embarrassment, expense, and ordeal and compelling him to live in a continuing state of anxiety, insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." 355 U.S. 184, 187–188, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). The expansion of federal criminal law into many areas also subject to state criminal statutes increases this tension.

Despite such developments and criticism of the dual sovereignty doctrine, the circuit courts have continued to reaffirm and apply *Bartkus, Abbate,* and *Heath* to uphold successive prosecutions by state and federal governments, as well as by the federal government and foreign governments. *See McKinney,* 53 F.3d at 676, *cert. denied,* 516 U.S. 970, 116 S.Ct. 431, 133 L.Ed.2d 346 (1995) (federal prosecution not barred by prior state guilty plea); *United States v. Guzman,* 85 F.3d 823, 826 (1st Cir.), *cert. denied,* 519 U.S. 1020, 117 S.Ct. 537, 136 L.Ed.2d 422 (1996) (federal prosecution not barred by prior foreign conviction); *United States v. Sewell,* 252 F.3d 647 (2d Cir.2001) (federal prosecution not barred by prior state acquittal); *United States v. Bell,* 113 F.3d 1345, 1351 n. 6 (3rd Cir.), *cert. denied,* 522 U.S. 984, 118 S.Ct. 447, 139 L.Ed.2d 383 (1997) (federal prosecution not barred by prior state acquittal); *United States v. Montgomery,* 262 F.3d 233, 238 (4th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 845, 151 L.Ed.2d 723 (2001) (federal prosecution not barred by prior state guilty plea); *United States v. Holmes,* 111 F.3d 463, 467 (6th Cir.1997) (federal prosecution not barred by prior state civil judgment of punitive damages); *United States v. Ray,* 238 F.3d 828, 835 (7th Cir.), *cert. denied,* 532 U.S. 1045, 121 S.Ct. 2014, 149 L.Ed.2d 1015 (2001) (federal prosecution not barred by prior state conviction); *United States v. Johnson,* 169 F.3d 1092, 1095–96 (8th Cir.), *cert. denied,* 528 U.S. 857, 120 S.Ct. 143,

145 L.Ed.2d 121 (1999) (same); *United States v. Male Juvenile*, 280 F.3d 1008, 1021 (9th Cir.2002) (federal prosecution not barred by prior tribal court prosecution); *United States v. Trammell*, 133 F.3d 1343, 1349–50 (10th Cir.1998) (federal prosecution not barred by prior state acquittal); *United States v. Baptista–Rodriguez*, 17 F.3d 1354, 1360–62 (11th Cir.1994) (federal prosecution not barred by failed foreign prosecution); *United States v. Rashed*, 234 F.3d 1280 (D.C.Cir.), *cert. denied*, 533 U.S. 924, 121 S.Ct. 2539, 150 L.Ed.2d 708 (2001) (federal prosecution not barred by foreign conviction).

Angleton acknowledges that the dual sovereignty doctrine is established law, binding on this court, although he urges its reexamination. Angleton also argues that the doctrine's exceptions and limits preclude its application to this case.

### III. The Limits of the Dual Sovereignty Doctrine

#### A. The *Bartkus* "Sham Prosecution" Exception

##### 1. *The Applicable Legal Standards*

In *Bartkus v. Illinois*, the Court suggested, in *dicta*, that despite extensive participation by federal authorities in the successive state trial, the defendant could not reasonably claim that the state "was merely a tool of the federal authorities" or that the "state prosecution was a sham and a cover for a federal prosecution." 359 U.S. at 123, 79 S.Ct. 676. In dissent, four justices agreed with the majority's suggestion that the first sovereign to prosecute a defendant could be so heavily involved in a second prosecution as to vitiate the dual sovereignty doctrine and bar the second prosecution under double jeopardy. Angleton urges that this *Bartkus* "sham prosecution" exception to the dual sovereignty doctrine applies here because of the extensive involvement of the Houston Police Department and other state officials in this

federal prosecution. The government responds by pointing out that if the *Bartkus* exception exists at all, it applies only in extraordinary circumstances that are not present here.

The facts of *Bartkus* itself demonstrate that there can be extensive involvement by the first sovereign in a second sovereign's prosecution without vitiating the application of the dual sovereignty doctrine. In *Bartkus*, the dissent described the extent of the federal authorities' involvement in the state prosecution that followed Bartkus's federal court acquittal. The federal authorities "solicited the state indictment, arranged to assure the attendance of state witnesses, unearthed additional evidence to discredit Bartkus and one of his alibi witnesses, and in general prepared and guided the state prosecution." 359 U.S. at 164–65, 79 S.Ct. 676. The FBI agents who conducted the federal investigation turned over all the evidence they had gathered to the state prosecutors. The " 'federal officers did instigate and guide this state prosecution' and 'actually prepared this case.' " *Id.* at 165, 79 S.Ct. 676 (quoting statements of Illinois's counsel at oral argument). The federal sentencing of one of the witnesses in the state case was postponed until after he testified against Bartkus at the state trial. *Id.* at 123, 79 S.Ct. 676. Despite the role of the federal authorities in instigating the successive state indictment and the extensive involvement of the federal authorities in the prosecution itself, the Supreme Court held that the record did "not sustain a conclusion that the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution." *Id.* at 123–24, 79 S.Ct. 676.

Since *Bartkus*, courts have considered a number of challenges to subsequent prosecutions based on the *Bartkus* sham prosecution exception to the dual sovereignty

doctrine. The Fifth Circuit has considered seven such challenges.[16] In one case, the Fifth Circuit expressed skepticism as to whether the sham prosecution exception in fact existed, or could be applied. *Patterson*, 809 F.2d at 247 n. 2 ("It is unclear whether such a holding has been established by the Supreme Court."); *see also United States v. Brocksmith*, 991 F.2d 1363, 1366 (7th Cir.), *cert. denied*, 510 U.S. 999, 114 S.Ct. 569, 126 L.Ed.2d 468 (1993); *United States v. Tirrell*, 120 F.3d 670, 677 (7th Cir.1997). However, other Fifth Circuit cases assume that the exception exists. *See Moore*, 958 F.2d at 650; *Logan*, 949 F.2d at 1380 n. 16. Other circuit courts have recognized the sham prosecution exception more readily than the Fifth Circuit. *See United States v. Guzman*, 85 F.3d 823, 826 (1st Cir.1996) ("We find the gravitational pull of *Bartkus* irresistible. Indeed, we think that the exception is compelled by the bedrock principle of dual sovereignty."); *United States v. Certain Real Property and Premises Known as 38 Whalers Cove Dr.*, 954 F.2d 29, 38 (2d Cir.1992); *In re Kunstler*, 914 F.2d 505, 517 (4th Cir.1990); *United States · v. Moore*, 822 F.2d 35, 38 (8th Cir.1987); *United States v. Bernhardt*, 831 F.2d 181, 182–83 (9th Cir.1987); *United States v. Guy*, 903 F.2d 1240, 1242 (9th Cir.1990); *United States v. Liddy*, 542 F.2d 76, 79 (D.C.Cir.1976).

The Supreme Court recently cited *Bartkus* in discussing whether "cooperative conduct" between the United States and foreign governments could support a claim that fear of foreign prosecution triggered the Fifth Amendment privilege against self-incrimination. In *United States v. Balsys*, 524 U.S. 666, 698–99, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998), the Court held that concern with foreign prosecution was beyond the scope of the Incrimination Clause of the Fifth Amendment. However, the Court stated, in *dicta*, that it was not foreclosing the argument that "cooperative conduct between the United States and foreign nations could [] develop to a point at which a claim could be made for recognizing fear of foreign prosecution under the Self–Incrimination Clause." *Id.* at 698, 118 S.Ct. 2218. Such an argument, if it could be made, would require a defendant to show that both the United States and the foreign government had "enacted substantially similar criminal codes aimed at prosecuting offenses of international character" and that the "United States was granting immunity from domestic prosecution for the purpose of obtaining evidence to be delivered to other nations as prosecutors of a crime common to both countries...." *Id.* at 699, 118 S.Ct. 2218. If these circumstances were demonstrated, a defendant could argue that the Fifth Amendment "should apply simply because that prosecution was not fairly characterized as distinctly 'foreign.'" *Id.* The Court noted the possibility that such a claim could be made if "cooperative conduct" between the United States and a foreign nation rose to the level that "the prosecution was as much on behalf of the United States as of the prosecuting nation, so that the division of labor between evidence gatherer and prosecutor made one nation the agent of the other, rendering fear of foreign prosecution tantamount to fear of a criminal case brought by the Government itself." *Id.* at 699–700, 118 S.Ct. 2218. The Court expressly stated that it was not deciding "whether such an argument

---

**16.** *See United States v. McKinney*, 53 F.3d 664 (5th Cir.1995); *United States v. Moore*, 958 F.2d 646 (5th Cir.1992); *United States v. Logan*, 949 F.2d 1370 (5th Cir.1991); *United States v. Cooper*, 949 F.2d 737 (5th Cir.1991); *United States v. Harrison*, 918 F.2d 469 (5th Cir.1990); *United States v. Patterson*, 809 F.2d 244 (5th Cir.1987); *United States v. McRary*, 616 F.2d 181 (5th Cir.1980).

should be sustained." *Id.* The Court cited *Bartkus* for the proposition that a "the mere support of one nation for the prosecutorial efforts of another does not transform the prosecution of the one into the prosecution of the other." *Id.* 79 S.Ct. at 700 (citing *Bartkus,* 359 U.S. at 122–24, 79 S.Ct. 676).

The Supreme Court in *Bartkus,* and all circuit courts to consider *Bartkus* sham prosecution claims, have held that even significant cooperation between the two sovereigns does not provide a basis for applying the *Bartkus* exception. *See, e.g., United States v. Rashed,* 234 F.3d 1280, 1284 (D.C.Cir.), *cert. denied,* 533 U.S. 924, 121 S.Ct. 2539, 150 L.Ed.2d 708 (2001); *United States v. Johnson,* 169 F.3d 1092, 1096 (8th Cir.), *cert. denied,* 528 U.S. 857, 120 S.Ct. 143, 145 L.Ed.2d 121 (1999); *United States v. Tirrell,* 120 F.3d 670, 677 (7th Cir.1997); *United States v. Certain Real Property and Premises Known as 38 Whalers Cove,* 954 F.2d 29, 38 (2d Cir.), *cert. denied,* 506 U.S. 815, 113 S.Ct. 55, 121 L.Ed.2d 24 (1992); *United States v. Davis,* 906 F.2d 829, 832–34 (2d Cir.1990); *United States v. Russotti,* 717 F.2d 27, 31 (2d Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984); *see also United States v. Moore,* 822 F.2d 35, 38 (8th Cir.1987); *United States v. Aleman,* 609 F.2d 298, 309 (7th Cir.1979). Every circuit to consider the issue has held that the cross-designation of a state law enforcement agent or district attorney as a federal official to assist or even to conduct a federal prosecution does not bring a case within the *Bartkus* exception to the dual sovereignty doctrine. *See United States v. Berry,* 164 F.3d 844, 845 (3d Cir.), *cert. denied,* 526 U.S. 1138, 119 S.Ct. 1794, 143 L.Ed.2d 1021 (1999); *United States v. Trammell,* 133 F.3d 1343, 1350 (10th Cir. 1998); *United States v. Figueroa–Soto,* 938 F.2d 1015, 1019 (9th Cir.1991), *cert. denied,* 502 U.S. 1098, 112 S.Ct. 1181, 117 L.Ed.2d 424 (1992); *United States v. Paiz,*

905 F.2d 1014, 1024 (7th Cir.1990), *cert. denied,* 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991); *United States v. Safari,* 849 F.2d 891, 893 (4th Cir.), *cert. denied,* 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988); *see also United States v. Perchitti,* 955 F.2d 674, 677 (11th Cir. 1992). The courts have held that one sovereign's request that another instigate a subsequent prosecution does not trigger the *Bartkus* exception. *See, e.g., Bartkus,* 359 U.S. at 123–24, 79 S.Ct. 676; *Harrison,* 918 F.2d at 472; *Tirrell,* 120 F.3d at 677; *Rashed,* 234 F.3d at 1283–84.

The courts have struggled to articulate when cooperation between successively prosecuting governments does rise to a level that makes the *Bartkus* exception apply. A number of courts have suggested that the exception applies only when one sovereign has essentially manipulated another sovereign into prosecuting. *See Whalers Cove,* 954 F.2d at 38 (suggesting that one sovereign "must have effectively manipulated the actions of the [other sovereign] so that [its] officials retained little or no independent volition."); *Guzman,* 85 F.3d at 827 (exception limited to situations in which one sovereign "thoroughly dominates or manipulates the prosecutorial machinery of another"); *accord Rashed,* 234 F.3d at 1283; *Baptista–Rodriguez,* 17 F.3d at 1361; *Kunstler,* 914 F.2d at 517; *Liddy,* 542 F.2d at 79.

These standards are applied to the facts disclosed by the present record.

### 2. Analysis

The Fifth Circuit has established a procedure to follow when a defendant invokes the sham prosecution exception. In the most recent Fifth Circuit case on the issue, the court explained:

When a defendant claims collusion between federal and state law enforcement officials, the defendant has the burden of

producing evidence to show a *prima facie* double jeopardy claim. Once a *prima facie* case is shown, the burden of persuasion shifts to the government.

*McKinney,* 53 F.3d at 676 (citing *Cooper,* 949 F.2d at 750–51); *see Stricklin,* 591 F.2d at 1117–18 (developing procedure for double jeopardy claims); *Patterson,* 809 F.2d at 247–48 (applying *Stricklin* procedure to claims of collusion under *Bartkus*); *Harrison,* 918 F.2d at 474–75 (same); *see also United States v. Doyle,* 121 F.3d 1078, 1089 (7th Cir.1997); *Guzman,* 85 F.3d at 830; *United States v. Benefield,* 874 F.2d 1503, 1505 (11th Cir. 1989) (all applying a similar procedure for double jeopardy claims). This court held a hearing under this procedure.[17]

The facts on which Angleton relies include the following:

- The federal government showed no interest in investigating Angleton on any federal charges until after Angleton's state acquittal, when state officials cooperated with the federal investigation into suspected money laundering, RICO, and income tax evasion.
- The United States Attorney's Office did not investigate Angleton for suspected federal murder for hire until after the Harris County District Attorney's Office requested it to do so.
- The FBI did not investigate Angleton for the murder of Doris Angleton until after state authorities had asked the United States Attorney's Office to extend the investigation.
- The failure of the state prosecution led first to the FBI's investigation of Angleton's activities that had a clear federal nexus, including suspected money laundering. When the attempt to indict Angleton for these offenses failed, a joint federal-state task force, consisting of the original state law enforcement investigators and an FBI agent with close ties to the Harris County District Attorney's office,[18] was formed with the sole purpose of prosecuting Angleton for murder for hire.
- The three and one-half years that elapsed between the state acquittal and the federal indictment points to a lack of independent federal interest.
- The Houston Police Department detectives who investigated Angleton for the state trial and testified in that trial

**17.** Before the hearing, Angleton filed a motion requesting discovery under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *United States v. Agurs,* 424 U.S. 953, 96 S.Ct. 1426, 47 L.Ed.2d 358 (1976), seeking evidence regarding the cooperation between the federal and state authorities in this case. (Docket Entry No. 40). The government opposed six of the eleven requests for discovery relating to the extent of the state and federal cooperation as unjustified under *Stricklin,* 591 F.2d at 1117, and not otherwise permitted by Federal Rule of Criminal Procedure 16 and related case law. Under *Stricklin,* 591 F.2d at 1117, a defendant is not entitled to additional discovery to assist in establishing a *prima facie* case of double jeopardy. "Material which is presently unavailable to the defendant through discovery or any other means is not made more accessible by our holding in this case." *Id.;*

*see also Harrison,* 918 F.2d at 475 (applying the *Stricklin* procedure to claim of double jeopardy based on the *Bartkus* sham prosecution exception). This court denied Angleton's discovery request. However, the government provided responsive information as to a number of the items requested on the record in open court. The testimony of Special Agent Rosenthal provided Angleton with extensive information as to the state's involvement in requesting the federal investigation and participating in that investigation and prosecution.

**18.** Special Agent Rosenthal is the wife of Charles A. Rosenthal, Jr., who, at the time of Angleton's prosecution, was chief of the felony division of the Harris County District Attorney's office. Charles Rosenthal was elected as the District Attorney for Harris County, Texas in November 2000.

have been deputized as federal deputy marshals for the Angleton federal investigation, although they continue to be paid by the City of Houston.

- The state prosecutors have provided the federal investigators and prosecutors with full access to all the information and evidence developed for the state prosecution.

- The investigation by the joint task force has yielded very little new evidence.

- The federal authorities interviewed the jurors from the state trial in efforts to improve their prosecutorial strategy for this second prosecution.

- The only witness to testify before the federal grand jury that indicted Angleton for murder for hire was an FBI agent who led the joint federal/state task force, and who is married to the Harris County District Attorney.

The Fifth Circuit has consistently rejected arguments of sham prosecution based on cooperation between successively prosecuting sovereigns. However, the Fifth Circuit has only considered seven cases raising the *Bartkus* sham prosecution exception, and the facts did not fairly raise the issue.

The Fifth Circuit first considered the *Bartkus* exception in *United States v. McRary*, 616 F.2d 181 (5th Cir.1980). In that case, the defendant and his wife hijacked a boat and forced the captain to take them to Cuba. The defendant was convicted in Cuba for an unknown crime. The record contained one communication from the United States State Department stating that the "Cuban authorities have decided to turn the [defendant and his wife] over to the competent courts, to be tried in accordance with Cuban law ...." *Id.* at 182. Four years later, the defendant returned to the United States, where he was indicted in federal court and convicted of kidnaping. On appeal, the defendant suggested that the "successive prosecutions should be treated as if they were obtained by the same sovereign." *Id.* at 185. There was scant evidence of any contact, much less cooperation, between the two sovereigns. The court held that the defendant made no showing that the Cuban prosecution was a "tool" of or a "sham and a cover for the federal prosecution." *Id.* (citing *Bartkus*, 359 U.S. at 123–24, 79 S.Ct. 676).[19]

The Fifth Circuit next considered a *Bartkus* sham prosecution claim in a case involving a police shooting, *United States v. Patterson*, 809 F.2d 244, 245 (5th Cir. 1987). One of the officers, Patterson, was tried and acquitted on state charges of attempted murder. The other officer, Brasher, was convicted in state court of aggravated perjury. *Id.* In a subsequent federal prosecution, Patterson was convicted of depriving the shooting victim of due process and of conspiring to violate the victim's civil rights, in violation of 18 U.S.C. §§ 241 and 242. Brasher was convicted as an accessory after the fact for making false statements about the shooting and for conspiracy to violate the victim's rights, in violation of 18 U.S.C. § 241. *Id.* at 246. The defendants argued that the federal prosecution was barred by collusion between the state and federal authorities, but presented only "unsubstantiated allegations" and no evidence other than a showing of "some cooperation between the prosecutors," which was insufficient. *Id.* The district court ruled that the defendants had failed to establish a *prima*

---

**19.** McRary also failed to introduce any evidence regarding his conviction in Cuba. *Id.* at 123, 79 S.Ct. 676. The court did not have to rely on the dual sovereignty exception because McRary failed to establish a *prima facie* case that the successive prosecutions were for the same offense, as required by *Blockburger*.

*facie* case of collusion under *Bartkus,* and the Fifth Circuit affirmed.[20]

In *United States v. Harrison,* 918 F.2d 469 (5th Cir.1990), the court considered a double jeopardy challenge to a federal conviction that followed a state conviction on lesser included charges arising from the same conduct. In 1982, state law enforcement authorities arrested Harrison and another individual on state drug charges following a drug surveillance operation conducted by county sheriff's officers. *Id.* at 471. The United States Customs officers were notified of the arrests, but took no steps to pursue federal involvement in the case. Harrison pleaded guilty to the state possession charges. In late 1984, the sheriff met with federal authorities and asked them to pursue federal charges against Harrison. Three years later, the United States Customs Service opened a file on the incident. A federal investigation began in May 1987. There was no evidence of state involvement in the federal investigation. Harrison was indicted for, and entered a conditional guilty plea to, federal drug charges arising from the same incident that formed the basis of his state conviction. Harrison argued that the federal prosecution was barred because it was a "sham," allowing state authorities to reprosecute him for the same offense. *Id.* at 475. The Fifth Circuit upheld the district court's ruling that there was no evidence of collusion between the state and federal authorities that prevented the successive prosecution by the federal government. *Id.*

In two cases decided in December 1991, the Fifth Circuit again rejected claims of collusion under *Bartkus.* In *United States v. Cooper,* 949 F.2d 737, 750–51 (5th Cir. 1991), the defendant was convicted of robbery in state court and subsequently convicted on a federal charge of unlawful possession of an unregistered firearm. Both charges grew out of Cooper's arrest by state law enforcement officials for aggravated robbery of a convenience store. *Id.* at 740. A sawed-off shotgun had been found in Cooper's vehicle. A federal agent interviewed Cooper in the state jail, but no federal charges were filed. Cooper was convicted on the state robbery charge and sentenced to prison. State officials mistakenly released him that same year. *Id.* A few weeks later the federal government indicted Cooper on a federal charge of unlawful possession of an unregistered firearm. *Id.* at 741. Cooper argued that the federal prosecutors had indicted him in order to help state authorities locate and reapprehend him after their mistake in releasing him from state prison. *Id.* at 751. The Fifth Circuit affirmed his conviction. The only evidence of "collusion" Cooper presented was the close timing between his mistaken release from state custody and his subsequent federal indictment. The court held this insufficient for a *prima facie* showing of collusion. *Id.* at 751. The court also noted that the federal government demonstrated its independent interest in prosecuting Cooper by proceeding with the federal prosecution even after Cooper was reapprehended by the state. *Id.* In addition, the court noted that the federal government's interest in Cooper predated his release from jail, although that interest was limited to a single interview by a federal agent. *Id.*[21]

---

**20.** Although the court did not address the issue, the defendants' double jeopardy claim in *Patterson* would fail, even if they established the *Bartkus* exception, because attempted murder and aggravated perjury under Texas law and violations of 18 U.S.C. §§ 241 and 242 are not the "same offense" under *Blockburger,* 284 U.S. at 300, 52 S.Ct. 180.

**21.** The *Cooper* court also considered the argument that federal charges were barred by the double jeopardy clause under *Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), which altered the *Blockburger* test by making jeopardy apply to the same conduct rather than to the same elements of the offense. *Grady,* however, was overruled three

In *United States v. Logan*, 949 F.2d 1370 (5th Cir.1991), decided one week after *Cooper*, the Fifth Circuit considered and dismissed the defendant's double jeopardy claim in a footnote. Following an investigation that appears to have been conducted primarily, if not solely, by state police officers, Stanley pleaded guilty to state marijuana possession charges.[22] Stanley was subsequently indicted on federal charges of conspiracy to distribute cocaine and marijuana and moved to dismiss on the basis of double jeopardy. On appeal following his conviction, the Fifth Circuit noted that although the dual sovereignty doctrine is "limited by the qualification that one sovereign's prosecution may not be used as a disguise for another sovereign's prosecution," Stanley had failed to introduce any evidence to show that the successive federal prosecution was a "sham." *Id.* at 1380 n. 16.

In *United States v. Moore*, 958 F.2d 646, 650 (5th Cir.1992), the defendant fired on state and federal agents executing a search warrant at a suspected crack house. *Id.* at 648. Moore was charged under Texas law with shooting a police officer, but convicted of a lesser included offense. *Id.* at 650 n. 3. Moore was then indicted for, and convicted on, federal charges of assaulting a federal officer with a deadly weapon and using a firearm in the commission of a predicate felony. On appeal, Moore argued that the federal prosecution was a tool of the state prosecution "because the state essentially 'lost' the first case against him." *Id.* at 650. The Fifth Circuit held that, even if Moore had raised the issue before the trial court, "it is clear that defendant committed two separate and independent acts, one against a state officer and one against a federal officer" making double jeopardy inapplicable. *Id.* at 650.

In the Fifth Circuit's most recent case on the *Bartkus* exception, *United States v. McKinney*, 53 F.3d 664, 676 (5th Cir.1995), the court considered a challenge to a federal prosecution for conspiracy to distribute narcotics that followed a state prosecution and guilty plea to state charges of violating an organized crime statute. Both charges arose from the same conduct.[23] *Id.* at 676. One of the defendants, Allen, alleged that the state investigating officers had failed to include certain additional charges in the state prosecution, which were not incorporated in the state plea bargain. Allen alleged that the state law enforcement officers later reported the additional crimes to federal officials, "manipulating the system." *Id.* The federal district court heard the federal prosecutor describe "the decision making process which preceded the federal indictment"

---

years later in *United States v. Dixon*, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), and the traditional *Blockburger* analysis restored as the standard for determining when subsequent charges constituted the same offense. Under *Blockburger*, the state charge of aggravated robbery and the federal charge of unlawful possession of an unregistered firearm are not the same offense. As in *McRary* and *Patterson*, the *Cooper* court did not have to rely on the dual sovereignty exception to permit the successive federal prosecution.

22. The law enforcement officers who primarily conducted the investigation were an agent of the Mississippi Bureau of Narcotics and another individual described as "Sergeant McVey" or "officer McVey." *Id.* at 1372, 1376 n. 9. It appears that FBI agents were also involved because the investigation ranged across Mississippi, Alabama and Florida; Logan was arrested in Mississippi, while Stanley was arrested in Florida. *Id.* at 1373.

23. Although the Fifth Circuit did not address the point, the federal and state charges were not the "same offense" under *Blockburger*. The state and federal offenses each contain an element not contained in the other and, thus, would not constitute double jeopardy even if charged in succession by the same sovereign.

and determined that Allen had not shown a *prima facie* case of collusion between the federal and state governments. *Id.* The Fifth Circuit affirmed. *Id.*

Angleton observes that each of the Fifth Circuit cases involved a lesser degree of one sovereign's involvement in a second sovereign's prosecution than is present in this case. However, the Fifth Circuit has considered cases involving some of the factors on which Angleton relies to support his sham prosecution argument. The Fifth Circuit has held that an extended delay between the first and second prosecutions and the absence of interest by federal officials until after a prior state prosecution ended did not raise an inference of collusion. *Harrison*, 918 F.2d at 472, 475. The Fifth Circuit, with other circuits, as well as the Supreme Court in *Bartkus* itself, have consistently rejected arguments that one sovereign's instigation of a another sovereign's successive prosecution creates an inference of collusion. *Bartkus*, 359 U.S. at 123–24, 79 S.Ct. 676; *Harrison*, 918 F.2d at 472; *Tirrell*, 120 F.3d at 677; *Rashed*, 234 F.3d at 1283–84. Courts in other circuits have consistently rejected arguments that the deputizing or cross-designating law enforcement agents or prosecutors who worked on the first prosecution to assist or conduct a second prosecution is a basis for the *Bartkus* exception. *Figueroa–Soto*, 938 F.2d at 1019; *Paiz*, 905 F.2d at 1024; *United States v. Raymer*, 941 F.2d 1031, 1037 (10th Cir. 1991). Courts have consistently rejected arguments that the delivery by the government that conducted the first prosecution of all evidence and information to the government conducting the second prosecution is a basis for an inference of a sham prosecution. *See United States v. Koon*, 34 F.3d 1416, 1439 (9th Cir.1994), *rev'd in part on other grounds*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *Figueroa–Soto*, 938 F.2d at 1018–19; *Baptis-*

*ta–Rodriguez*, 17 F.3d at 1361; *Rashed*, 234 F.3d at 1284.

There are only two reported cases in which circuit courts have remanded a case to the district court for further fact-finding on the applicability of the *Bartkus* exception. *See United States v. All Assets of G.P.S. Automotive Corp.*, 66 F.3d 483, 496 (2d Cir.1995); *United States v. Bernhardt*, 831 F.2d 181, 183 (9th Cir.1987). In *G.P.S. Automotive*, the owner of a automotive salvage yard was convicted in New York state court of possession of stolen property, illegal possession of vehicle identification numbers, and falsifying business records. Following the state conviction, the federal government brought an *in rem* civil forfeiture action seeking the assets of the business based on alleged violations of the federal statutes prohibiting trafficking in vehicles or parts with tampered numbers and money laundering. The district court held that the dual sovereignty doctrine permitted the subsequent federal forfeiture action. The Second Circuit remanded for further fact-finding on the *Bartkus* exception. The court noted that the

Suffolk County District Attorney's Office referred this case to the U.S. Attorney in the first instance, that much of the evidence used in the federal forfeiture action was developed in connection with their state criminal proceedings, and that the Suffolk County district attorney was cross-designated as a Special Assistant U.S. Attorney for the purpose of prosecuting the federal forfeiture action against GPS and the Schaffers.

*Id.* at 494. The court noted that these facts did not establish the "narrow exception to the dual sovereignty doctrine." *Id.* at 495. However, the defendants also provided evidence that the state would receive a very large percentage of any federal forfeiture proceeds. *Id.* at 496. The court concluded that if, on remand, the evidence

demonstrated that state would receive "all, or a disproportionate share, of the forfeiture proceeds," that "the federal forfeiture was essentially instigated by the state," and that it was "conducted almost exclusively by state officials from state offices," then the *Bartkus* exception would be "strongly implicated." *Id.* No subsequent rulings in the case are reported. No similar facts regarding forfeiture of assets are suggested in the present record.

The Ninth Circuit has also remanded a case for further fact-finding as to the *Bartkus* sham prosecution exception. In *United States v. All Assets Of G.P.S. Automotive Corp.*, 66 F.3d 483 (9th Cir.1995), the district court dismissed the indictment based on *Bartkus* and the Ninth Circuit remanded. The Bernhardts were originally charged by the State of Hawaii for conspiracy and misapplication of bank funds. The state indictment was dismissed as barred by limitations. The state prosecutor then asked the United States Attorney's Office in Hawaii to initiate a federal prosecution. There had been no prior federal connection with the case. The state prosecutor became the lead attorney for the federal case as a special assistant United States Attorney, although the state continued to pay his salary. The Ninth Circuit reversed the district court's decision to dismiss, stating that "[i]t is clear the *Bartkus* exception does not bar cooperation between prosecuting sovereigns." *Id.* at 182, 79 S.Ct. 676 (citing *Moore*, 822 F.2d at 38). The court agreed with the district court that "these circumstances are troubling," but that "sufficient independent federal involvement would save the prosecutions from [the *Bartkus*] exception." *Id.* at 183, 79 S.Ct. 676. The Ninth Circuit remanded to the district court to determine the extent of independent federal involvement in the successive prosecution. *Id.*

There is only one published, unreversed decision in which a district court dismissed

an indictment in a successive prosecution based on *Bartkus*. In *United States v. Belcher*, 762 F.Supp. 666, 671 (W.D.Va. 1991), a federal indictment followed the dismissal of state indictments. In that case, the state prosecutor and the assistant United States Attorney was the same person. The federal district court found that the simultaneous state and federal power possessed by the single prosecutor occupying both state and federal roles led to the conclusion that the second prosecution was a sham for the first, unsuccessful prosecution. *Id.* No appeal is reported. No similar facts are present in this case.

Angleton acknowledges that cooperation between state and federal law enforcement does not ordinarily create "collusion" and is encouraged by the courts. *See Bartkus,* 359 U.S. at 123–124, 79 S.Ct. 676; *United States v. Marek,* 238 F.3d 310, 323 (5th Cir.2001). Angleton argues that no Fifth Circuit case considering a *Bartkus* sham prosecution argument has involved an investigation conducted solely by the first prosecution's law enforcement officers followed by a joint investigation by a specially formed federal-state task force, including the same state law enforcement officers. The government has not cited such a case. However, as noted above, the reported cases address close involvement by the government officers and agents involved in a first prosecution with a successive prosecution, similar in many respects to the level of cooperation between the state police officers and district attorneys on the one hand and the federal investigators and Assistant United States Attorneys on the other. *Bartkus,* 390 U.S. at 123–24; *Figueroa–Soto,* 938 F.2d at 1019.

■ The record is clear that the United States Attorney's Office for the Southern District of Texas sought permission from the United States Justice Department be-

fore deciding to seek a federal murder for hire indictment against Angleton. Assistant United States Attorneys have vigorously pursued this prosecution. They, not state prosecutors, are prosecuting the case. There is no basis to conclude that the state officials "so effectively manipulated the actions of the [United States] so that [its] officials retained little or no independent volition" in deciding to prosecute and in pursuing the prosecution. *United States v. 38 Whalers Cove,* 954 F.2d at 38; *Liddy,* 542 F.2d at 79; *Baptista–Rodriguez,* 17 F.3d at 1361; *Rashed,* 234 F.3d at 1283. The facts do not support an inference of collusion that would bring this case within the *Bartkus* exception to the dual sovereignty doctrine as it has been applied by the courts.

Angleton's argument as to federal and state cooperation in this federal prosecution is less one of collusion and more an argument that there is no separate or compelling federal interest. Angleton's argument is not so much that the state government colluded with the federal government so that the state could in effect reprosecute him, but rather that the federal government has an insufficient federal interest in this prosecution to warrant the application of the dual sovereignty exception to the double jeopardy protection. (Docket Entry No. 38, at 21–37). Angleton frames this argument in several ways.

He argues that the federal government cannot base a successive prosecution on an incorporated state statute, citing *Houston v. Moore,* 18 U.S. (5 Wheat.) 1, 5 L.Ed. 19 (1820). He also argues that collateral estoppel precludes this prosecution. Finally, Angleton argues that the government's decision to pursue this successive prosecution strains the limits of the Double Jeopardy and Commerce Clauses. This court now turns to these arguments.

## B. Federal Incorporation of a State Statute

Angleton argues that because section 1958 incorporates and derivatively enforces the Texas murder statute, the federal government has no independent, federal interest in prosecuting him and is not a separate sovereign for the purpose of the dual sovereignty doctrine. Angleton bases his argument on a Supreme Court case decided before the Civil War, *Houston v. Moore,* 18 U.S. (5 Wheat.) 1, 5 L.Ed. 19 (1820). *Houston* did not involve successive prosecutions. In that case, the Court reviewed the constitutionality of a Pennsylvania court martial proceeding that convicted a member of the state militia for failing to answer the president's call to service. The Pennsylvania military tribunal convicted Houston under a state law punishing conduct that federal law also addressed.[24]

24. The Pennsylvania statute in question provided:

> That if any commissioned officer of the militia, shall have neglected or refused to serve when called into actual service, in pursuance of any order or requisition of the President of the United States, he shall be liable to the penalties defined in the act of the congress of the United States, passed on the twenty-eighty day of February, one thousand seven hundred and ninety-five: *that is to say,* Each and every officer having so offended, shall forfeit a sum not exceeding one year's pay nor less than one month's pay, to be determined and ad-

> judged by a court martial; and shall, moreover, be liable to be cashiered by sentence of a court martial, and to be incapacitated from holding a commission in the militia for a term not exceeding twelve months, as the discretion of said court; or shall be liable to any penalty which may have been prescribed since the date of the passage of the said act, or which may hereafter be prescribed by any law of the United States. Acts of the General Assembly of the Commonwealth of Pennsylvania 1813–1814, Act of March 28, 1814, § 21 (emphasis in original). The next paragraph of the Pennsylvania statute provided that:

Houston was tried by the Pennsylvania court martial, found guilty, and sentenced to pay a fine. *Id.* When the United States deputy marshal for the district levied on his property, as provided under the federal statute, Houston brought an action for trespass in the state court against the deputy marshal. At trial, Houston argued that the Pennsylvania statute under which he was convicted was contrary to the Constitution of the United States. *Id.* 18 U.S.(5 Wheat.) at 4. The jury found for the deputy marshal and the Pennsylvania Supreme Court affirmed the verdict.

Before the United States Supreme Court, Houston argued that the Pennsylvania statute was unconstitutional because

> Each and every non-commissioned officer and private of the militia who shall have neglected to serve when called into actual service, in pursuance to an order or requisition of the president of the United States, shall be liable to the penalties defined in the act of the congress of the United States, passed the twenty-eighth of February, one thousand seven hundred and ninety-five: *that is to say*, Each and every non-commissioned officer or private having so offended, shall forfeit a sum not exceeding one year's pay nor less than one month's pay, to be determined and adjudged by a court martial and shall be liable to be imprisoned by a like sentence, on failure of payment of the fines adjudged, for one calendar month for every five dollars of such fine, or to any penalty which may have been prescribed since the date of the passage of said act, or which may hereafter be prescribed by any law of the United States.

*Id.* (emphasis in original). The Pennsylvania statute provided that a state court martial shall try those accused under the statute. *Id.* The president of the state court martial

> shall furnish to the marshal of the United States, or to his deputy, and also the comptroller of the treasury of the United States, a list of the delinquents fined, in order that the further proceedings directed to be had thereon by the laws of the United States, may be completed.

*Id.*

Congress retained the exclusive power to regulate the militia. *Id.* at 5. In support of his position, Houston contended that if the state had concurrent jurisdiction to regulate the militia, a conviction by the state court would either "oust the jurisdiction of the United States' Court Martial, or might subject the accused to be twice tried for the same offense." *Id.* at 31. The Court concluded that the state statute conferred "authority upon a State Court Martial to enforce the laws of the United States against delinquent militia men." *Id.* at 32. The state had provided jurisdiction to its military tribunal to apply and enforce federal law. In response to Houston's argument regarding double jeopardy, the Court stated:

> Section 5 of the Act of the United States Congress passed on February 28, 1795, provided:
>> That every officer, non-commissioned officer, or private of the militia, who shall fail to obey the orders of the President of the United States, in any of the cases before recited, shall forfeit a sum not exceeding one year's pay, and not less than one month's pay, to be determined and adjudged by a court martial; and such officer shall, moreover, be liable to be cashiered by sentence of a court martial, and be incapacitated from holding a commission in the militia, for a term not exceeding twelve months, at the discretion of said court: And such non-commissioned officers and privates shall be liable to be imprisoned, by a like sentence, on failure of payment of the fines adjudged against them, for one calendar month, for every five dollars of such fine.
>
> Act of February 28, 1795, § 5, 1 Stat. 424. The Act also provides that the "courts martial for the trial of the militia shall be composed of militia officers only" and the fines assessed are to be certified by the presiding officer to the marshal of the district. *Id.* §§ 6–7. The marshal or his deputy "shall forthwith proceed to levy the said fines with costs, by distress and sale of the goods and chattels of the delinquent. . . ." and shall pay the fines to the "supervisor of the revenue in the district in which they are collected." *Id.* §§ 7–8.

if the jurisdiction of the two Courts be concurrent, the sentence of either Court, either of conviction of acquittal, might be pleaded in bar of the prosecution of the other, as much so as the judgment of a State Court, in a civil case of concurrent jurisdiction, may be pleaded in bar of an action for the same cause, instituted in a Circuit Court of the United States.

*Id.* at 31. Justice Story dissented, arguing that Congress was given the exclusive power under the Constitution to regulate the militia. Foreshadowing Justice Black's future dissents in *Bartkus* and *Abbate,* Justice Story argued that the dual sovereigns of federal and state governments created by our federal system dictated avoiding concurrent jurisdiction:

In a government formed like ours, where there is a division of sovereignty, and, of course, where there is a danger of collision from the near approach of powers to a conflict with each other, it would seem a peculiarly safe and salutary rule, that each government should be left to enforce its own penal laws in its own tribunals.

*Id.* at 69. In support of his argument, Justice Story noted the effect of allowing concurrent jurisdiction under the statutes in question:

In the first place, if the trial in the State Court Martial be on the merits, and end in a condemnation or acquittal, one of two things must follow, either that the United States' Courts Martial are there-

by divested of their authority to try the same case, in violation of the jurisdiction confided to them by Congress; or the delinquents are liable to be twice tried and punished for the same offence, against the manifest intent of the act of Congress, the principles of common law, and the genius of our free government.

*Id.* at 72 (Story, J., dissenting). However, Justice Johnson rejected the suggestion that successive prosecutions by separate sovereigns were improper, stating in his concurrence: "Why may not the same offence be made punishable both under the laws of the states and the laws of the United States? Every citizen of a state owes a double allegiance...." *Id.* at 33 (Johnson, J., concurring).

*Houston v. Moore* has been cited for numerous propositions.[25] Of primary importance to Angleton's argument is the citation to *Houston v. Moore* in *Bartkus,* 359 U.S. at 130, 79 S.Ct. 676. The *Bartkus* Court observed that two state court decisions had misinterpreted *Houston v. Moore* to preclude successive prosecutions by state and federal governments. The Court noted that the majority's statement in *Houston v. Moore* was limited by the conclusion that "the state statute imposed state sanctions for violation of a federal criminal law"; in such a case, the "two trials would not be of similar crimes arising out of the same conduct; they would be for the same crime." *Id.* The Court concluded that *Houston v. Moore* "can be cited only for the presence of a bar in a

---

**25.** *See, e.g., Ex Parte Milligan,* 71 U.S. (4 Wall) 2, 44 n. 31 (1866) (citing *Houston v. Moore* as supporting the position that a person is not subject to a United States Court Martial until he has gone to the place of rendezvous and been enrolled and mustered into the national militia); *State of California v. Zook,* 336 U.S. 725, 750 n. 13, 69 S.Ct. 841, 93 L.Ed. 1005 (1949) (citing *Houston v. Moore* as holding that where Congress has exercised its power, the states may not add to the provi-

sions of Congress); *United States v. Wheeler,* 435 U.S. 313, 317 n. 7, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (citing *Houston v. Moore* as having noted "the problems arising from concurrent federal and state criminal jurisdiction"); *United States v. Emerson,* 270 F.3d 203, 249 n. 57 (5th Cir.2001) (citing *Houston v. Moore* as holding that the states retain the power to organize, train, and regulate militia consistent with federal law).

case in which the second trial is for a violation of the very statute whose violation by the same conduct has already been tried in the courts of another government empowered to try that question." *Id.* Angleton contends that this is that rare case.

Angleton's argument is that section 1958 incorporates *in haec verba* the Texas capital murder statute under which he was previously acquitted. Section 1958 requires that the defendant travel in or use facilities of interstate commerce "with intent that murder be committed in violation of the laws of any State...." Angleton contends that the principal element of both section 1958 and Texas Penal Code § 19.03 is a violation of Texas law that both the federal and state governments are empowered to enforce. Because section 1958 refers to state law to define an element of the offense, Angleton argues that the federal government is not pursuing a federal crime, but is merely attempting to enforce the Texas statute a second time. In support of this argument, Angleton points out that the only distinguishing element between the two statutes is the interstate commerce "jurisdictional hook" contained in section 1958. He argues that the addition of this federal jurisdictional hook cannot properly convert the state offense into a federal crime.

Angleton cites no case in which this specific argument formed the basis for dismissing a successive indictment.[26] *But cf. United States v. Mason,* 213 U.S. 115, 29 S.Ct. 480, 53 L.Ed. 725 (1909) (barring federal prosecution for conspiracy based on acquitted state crimes where conspiracy charge sought to impose the punishment imposed by state law for the acquitted crimes, but not citing *Houston v. Moore* ). The government responds that the inclu-sion of the language "the laws of any State" in section 1958 does not incorporate the Texas capital murder statute. The government points to cases decided under the RICO statute and the Travel Act, which both refer to violations of state law as elements of the federal offense. *See United States v. Frumento,* 563 F.2d 1083, 1086 (3d Cir.1977) (federal RICO prosecution not barred by state court acquittals for acts charged as predicate offenses); *United States v. Licavoli,* 725 F.2d 1040, 1047 (6th Cir.1984) (same); *United States v. Cerone,* 452 F.2d 274, 286 (7th Cir.1971) (Travel Act punishes use of facilities in interstate commerce in furtherance of violations of state statutes rather than substantive violations of the state statutes; state law "serves merely a definitional purpose").

Unlike the state legislation conferring authority on the state court martial at issue in *Houston v. Moore,* section 1958 does not, by its terms, empower a federal court to try a case under Texas Penal Code § 19.03. Although the elements to be proved at trial under each statute are the same, except for the jurisdictional element—which is why the double jeopardy issue arises in the first place—section 1958 does not incorporate Texas Penal Code § 19.03 to the same extent, or in the same manner, as the Pennsylvania statute incorporated the Congressional Act of February 28, 1795.

The Pennsylvania statute specifically referenced the federal act of February 28, 1795 and provided for precisely the same penalties. The fines imposed under the Pennsylvania statute were referred to the United States marshal for "further proceedings directed to be had thereon by the

---

**26.** One explanation for the lack of applicable precedent is identified by a law review article on the dual sovereignty doctrine, noting that "[o]ne should not attempt to enlist Houston's narrow holding or muddled rationale in any legal argument." Braun, *Praying to False Sovereigns,* 20 AM.J.CRIM.L. at 9.

laws of the United States." Acts of the General Assembly of the Commonwealth of Pennsylvania 1813–1814, Act of March 28, 1814, § 21. Militiaman Houston was fined by the state tribunal, but under the federal statute. The fines were levied by the United States marshal, to be paid to the United States supervisor of revenue for the district. Act of February 28, 1975, § 8. The Pennsylvania statute punished the defendant for the identical conduct proscribed and defined by the federal statute, imposed penalties under the federal statute, and provided that fines collected under the state statute would be paid to the federal government. Section 1958 and Texas Penal Code § 19.03 do not have this same relationship.

Section 1958 punishes the defendant for the same conduct as Texas Penal Code § 19.03, with the additional elements necessary to invoke federal jurisdiction, but does not impose penalties under Texas law by the Texas government. Section 1958 does not incorporate Texas Penal Code § 19.03 such that an acquittal under section 19.03 could bar a prosecution under section 1958.

## C. The Role of Collateral Estoppel

■ Angleton argues that elements essential to the federal murder for hire charges against him were actually litigated and necessarily determined in the state capital murder trial, and that collateral estoppel precludes relitigation. The Supreme Court has stated that the principle of collateral estoppel in criminal cases is embodied in the Fifth Amendment's proscription against double jeopardy. *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443, 90 S.Ct. 1189. Collateral estoppel will nor-

mally bar a successive prosecution "if one of the facts necessarily determined in the former trial is an essential element in a subsequent prosecution." *United States v. Brackett*, 113 F.3d 1396, 1398 (5th Cir. 1997). The Fifth Circuit has rejected " 'attempts to erect a due process basis, independent of the double jeopardy clause, for the application of collateral estoppel' " in criminal cases. *Nichols v. Scott*, 69 F.3d 1255, 1268 (5th Cir.1995) (quoting *Showery v. Samaniego*, 814 F.2d 200, 203 (5th Cir. 1987)).

The parties do not dispute that both section 1958 and Texas Penal Code § 19.03 require proof of intent to commit murder and that the element of intent was necessarily determined by the state court acquittal. (Docket Entry No. 38, at 17; Docket Entry No. 51, at 9–10). The issue presented by Angleton's argument is whether the State of Texas and the federal government are the "same party" for the purpose of collateral estoppel.

The parties dispute the standard to be applied in determining whether the federal government is the "same party" as the State of Texas and barred from prosecuting Angleton for murder for hire. Angleton argues that the mutuality of interest between the state government in the first prosecution and the federal government in the second prosecution satisfies the "same party" requirement for collateral estoppel. In support of his argument, Angleton cites *dicta* in *Ashe v. Swenson* indicating that "same party" is defined as broadly in criminal cases as in civil matters. (Docket Entry No. 38, at 18) (citing *Ashe*, 397 U.S. at 443, 90 S.Ct. 1189). However, *Ashe* dealt with successive prosecutions by the same government; the dual sovereignty doctrine did not apply. The issues in *Ashe* were whether collateral estoppel is part of the Fifth Amendment's guarantee against double jeopardy and whether the jury in a

prior prosecution necessarily determined a fact at issue in a second prosecution by the same party. *Ashe,* 397 U.S. at 444–47, 90 S.Ct. 1189. *Ashe* does not control the "same party" issue in this case.

The government responds that because collateral estoppel is applied to implement double jeopardy, the dual sovereignty doctrine governs the "same party" determination. The government asserts that since the state and federal governments are separate sovereigns, they are separate parties. The Fifth Circuit has held that "[c]ollateral estoppel does not apply to successive prosecutions by the state and federal governments because the party that the defendant seeks to estop in the second prosecution was not a party to the first trial." *United States v. Hayes,* 589 F.2d 811, 819 (1979). In *Hayes,* the defendant was acquitted of capital murder under Texas law, then indicted under federal law for violating the civil rights of the victim. Hayes argued that the federal prosecution should be collaterally estopped due to the prior state acquittal. The court disagreed. *Id.* However, Hayes did not argue that the federal and state prosecutors were in privity or had mutuality of interests, so as to make them the same party for collateral estoppel purposes.

Three circuit courts have considered the standard that applies in determining whether a separate sovereign should be bound by a prior criminal prosecution under *Ashe.* In *United States v. Davis,* 906 F.2d 829, 832–34 (2d Cir.1990), the court considered whether a federal prosecution was bound by a state court's ruling suppressing drug evidence in a case against the same defendants arising from the same conduct. The defendant argued that the federal prosecution should be collaterally estopped because of the close relationship between the federal and state investigations, which were conducted by an organized joint task force targeting the drug trade in that area. The court recognized that, under *Ashe,* collateral estoppel could bar further litigation of an issue decided in a criminal defendant's favor. *Id.* at 833 (citing *Ashe,* 397 U.S. 436, 90 S.Ct. 1189). However, because *Ashe* rested on the Fifth Amendment's Double Jeopardy Clause, the dual sovereignty doctrine applied and required recognition of the federal and state governments as separate parties for the purpose of collateral estoppel. *Id.* The Second Circuit then proceeded to analyze whether the Due Process Clause alone required the application of collateral estoppel, an argument the Fifth Circuit has rejected. *See Nichols,* 69 F.3d at 1268. The court considered the *Bartkus* sham prosecution analysis and determined that the evidence did not show even active participation by the federal prosecution in the state court proceeding. *Davis,* 906 F.2d at 835.

The Eighth Circuit has also considered a collateral estoppel challenge under *Ashe.* In *United States v. Garner,* 32 F.3d 1305, 1311 (8th Cir.1994), the defendant was charged in state court with robbery and with being an "armed criminal" based on his use of a gun in committing the robbery. Garner pleaded guilty to a lesser included offense; the armed criminal charge was dismissed with prejudice. He was then convicted on a federal charge of being a felon in possession of a firearm. On appeal, Garner urged that under the *Bartkus* sham prosecution exception to the dual sovereignty doctrine, the federal and state governments should be viewed as the same party. If collateral estoppel applied, the state court's dismissal of the armed criminal charge would preclude the federal government from pursuing the felon in possession prosecution. Garner did not argue for the application of a lower standard to establish privity or mutuality of interests. The court rejected Garner's argument. *Id.* at 1311.

In *United States v. Tirrell*, 120 F.3d 670, 677 (7th Cir.1997), the court considered a claim that a state prosecution for armed robbery, armed violence, and unlawful use of a firearm collaterally estopped a subsequent federal prosecution of the defendant as a felon in possession of a firearm. The Seventh Circuit found no evidence to support the *Bartkus* sham prosecution exception to the dual sovereignty doctrine. The court also held that collateral estoppel could not apply, reasoning that "[i]t would be anomalous indeed if a sovereign were allowed the greater power of reprosecuting individuals for offenses for which they had been acquitted but were denied the lesser power of proving the underlying facts of such offenses." *Id.; see also United States v. Safari*, 849 F.2d 891 (4th Cir. 1988) (prior state court prosecution did not have collateral estoppel effect on federal government's successive prosecution).[27]

Most of the courts that have considered collateral estoppel in successive prosecutions by separate sovereigns have applied the standards of the dual sovereignty doctrine and its exception. *Davis*, 906 F.2d at 832–34; *Garner*, 32 F.3d at 1311; *Tirrell*, 120 F.3d at 677; *Belcher*, 762 F.Supp. at 670–71; *Londono–Rivera v. Virginia*, 155 F.Supp.2d 551, 562–63 (E.D.Va.2001); *Rashed*, 234 F.3d at 1282–83. *Ashe*, which is based on the Double Jeopardy Clause of the Fifth Amendment, supports this approach. *Id.* Angleton's collateral estoppel argument fails for the same reasons his *Bartkus* sham prosecution exception argument fails; under the dual sovereignty doctrine, the state court acquittal does not bar the successive prosecution by the federal government.[28]

Even if this court applied a lower standard of privity to determine whether the successively prosecuting sovereigns are the same parties for collateral estoppel purposes, Angleton's argument would still fail. If traditional standards of collateral estoppel apply to this criminal prosecution, this court would give the Texas court judgment the same preclusive effect it would have under Texas law. *See McCoy v. Hernandez*, 203 F.3d 371, 374 (5th Cir.2000) (considering whether Texas police officers and the State of Texas were the same party for purposes of collateral estoppel) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984)). Under Texas law, the party seeking to assert collateral estoppel must demonstrate: (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) the facts determined were essential to the judgment in the first action; and (3) the parties were cast as adversar-

---

**27.** In *United States v. Bonilla Romero*, 836 F.2d 39, 42 (1st Cir.1987), the First Circuit briefly discussed the "same party" issue under *Ashe* in a successive prosecution. However, in that case, the court held that jeopardy did not attach in the first prosecution and *Ashe* did not provide a basis for applying collateral estoppel. The court considered, but declined to decide, whether the Due Process Clause alone could support an application of collateral estoppel in a criminal case.

**28.** The Supreme Court has not addressed whether nonmutual collateral estoppel applies between successively prosecuting sovereigns. However, the Court has determined that nonmutual collateral estoppel does not apply between successively prosecuted defendants. In *Standefer v. United States*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980), the Supreme Court held that non-mutual collateral estoppel was unavailable to an alleged aider and abettor who attempted to estop the government from proving that he aided and abetted the alleged principal on the basis of the government's failure to convict the principal. The Court noted that, unlike civil litigation, criminal prosecutions involve the "important federal interest in the enforcement of the criminal law." *Id.* at 24–25, 100 S.Ct. 1999. The court held that policy considerations in criminal cases outweighed the "economy concerns that undergird the estoppel doctrine." *Id.* at 25, 100 S.Ct. 1999.

ies in the first action. *See McCoy,* 203 F.3d at 374 (citing *Sysco Food Services v. Trapnell,* 890 S.W.2d 796, 801 (Tex.1994) (citations omitted); *State Farm Fire & Cas. Co. v. Fullerton,* 118 F.3d 374, 377 (5th Cir.1997)).

The federal government was clearly not a party to the prior state prosecution; Angleton must demonstrate that the federal prosecution was in privity with the state prosecution. Parties are in privity for the purposes of collateral estoppel when: (1) they control the action; (2) their interests are represented by a party to the action; or (3) they are successors in interest, deriving their claims through the party to the prior action. *HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 890 (Tex.1998). "Due process requires that the rule of collateral estoppel operate only against persons who have had their day in court either as a party to the prior suit or as a privy, . . . ." *Benson v. Wanda Petroleum Co.,* 468 S.W.2d 361, 363 (Tex.1971); *see Eagle Props., Ltd. v. Scharbauer,* 807 S.W.2d 714, 721 (Tex.1990); *Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, 819 (Tex.1984). Privity extends to those who are "so connected with a party to the judgment as to have such an identity of interest that the party to the judgment represented the same legal right." *Benson,* 468 S.W.2d at 363; *Cannon v. Tex. Indep. Bank,* 1 S.W.3d 218, 224 (Tex. App.—Texarkana 1999, pet. denied).

Applying these factors to the present case, without considering the dual sovereignty doctrine, this court finds that the federal government was not in privity with the State of Texas. There is no evidence that the federal prosecution had controlled the state prosecution. To the contrary, Angleton does not claim that the federal prosecutors or investigators were involved in the state prosecution. The issue is whether the federal and state governments have "an identity of interests" such that

the federal government is bound by the outcome of the state prosecution because the two governments had the same legal right. The Texas Court of Criminal Appeals considered a similar issue in *Reynolds v. State,* 4 S.W.3d 13 (Tex.Crim.App. 1999). In *Reynolds,* the defendant was arrested for driving while intoxicated and his driver license was suspended pending an administrative hearing by the Department of Public Safety. At that hearing, the defendant argued that there was no reasonable suspicion for stopping him. The administrative body agreed. The state district attorney then successfully prosecuted the defendant for driving while intoxicated. Defendant argued on appeal that the district attorney was collaterally estopped from litigating this issue in the criminal proceeding because the district attorney's office and the Department of Public Safety were in privity. The Court of Criminal Appeals disagreed, explaining that the Department of Public Safety and state prosecutors do not have the same interest because they are controlled by different authorities. *Id.* at 15 (adopting concurring opinion of Judge Womack in *State v. Brabson,* 976 S.W.2d 182, 185 (Tex.Crim.App.1998) (explaining in detail the decision of the court on the issue of privity)).

In this case, it is undisputed that the Harris County District Attorney's Office controlled the first prosecution and the United States Attorney's Office for the Southern District of Texas is controlling the federal prosecution. Texas law would not give the Texas state acquittal estoppel effect to bar this federal prosecution.

The Fifth Circuit has held that "collateral estoppel does not apply to successive prosecutions by the state and federal governments." *Hayes,* 589 F.2d at 811. The state prosecution does not collaterally estop this federal prosecution.

### D. The Argument of an Inadequate Federal Interest: Section 1958, the Commerce Clause, and Double Jeopardy

Angleton argues that this successive federal prosecution for the murder of his wife, following a state acquittal for capital murder, raises serious constitutional issues that can only be avoided by reexamining the dual sovereignty doctrine; holding the application of section 1958 to this case unconstitutional under the Commerce Clause; or limiting the application of section 1958 to cases where an independent and compelling federal interest is present. Angleton argues that changes in the jurisprudence underlying the dual sovereignty doctrine, the increasing federalization of criminal law, and changes in the jurisprudence of the Commerce Clause make this federal prosecution untenable. Angleton argues that this court should avoid these constitutional issues by holding that the government must demonstrate to the court a sufficient, independent federal interest in prosecuting Angleton for murder for hire before this prosecution can proceed. Each of these arguments is examined below.

### 1. Changes in the Constitutional Underpinnings of the Dual Sovereignty Doctrine

Angleton adopts the argument of some courts, and a number of scholars, that the Supreme Court's decisions recognizing that the Bill of Rights, including the Double Jeopardy Clause, applied to the states and the increasing federalization of criminal law has undercut the constitutional underpinnings from the dual sovereignty doctrine and require a reexamination. *See United States v. All Assets of G.P.S. Automotive Corp.,* 66 F.3d 483, 498 (2d Cir. 1995) (Calabresi, J., concurring) ("a new look by the High Court at the dual sovereignty doctrine and what it means today for the safeguards the Framers sought to place in the Double Jeopardy Clause would surely be welcome"); *United States v. Grimes,* 641 F.2d 96, 101 (3d Cir.1981); *United States v. Claiborne,* 92 F.Supp.2d 503, 509 (E.D.Va.2000) ("Where the Commerce Clause has been broadly expanded and the line between federal and state crimes has been blurred, . . . the rationale of the dual sovereignty doctrine is nullified . . ."), *aff'd,* 2001 WL 173163, *cert. denied,* 533 U.S. 938, 121 S.Ct. 2569, 150 L.Ed.2d 733; Braun, 20 Am.J.Crim.L. at 42–54; Amar & Marcus, 95 Colum.L.Rev. at 5–20; Guerra, 73 N.C.L.Rev. at 1159.[29] These commentators have noted that although the Court has recognized these changes by overruling the dual sovereignty doctrine as it had been applied to other constitutional protections, *Lanza, Bartkus,* and *Abbate* have remained in place. Despite decisions recognizing that the application of Fourth Amendment principles against states required the rejection of the "silver platter" doctrine, and that the application of the Incrimination Clause to the states required the rejection of the dual sovereignty doctrine in the area of compelled self-incrimination, the Court has not discussed the impact of *Benton's* incorporation of the Double Jeopardy Clause on *Bartkus* and *Abbate.*

---

**29.** A different perspective is provided in *United States v. McHan,* 966 F.2d 134, 139 (4th Cir.1992), in which the court explained:

The Double Jeopardy Clause imposes a rule of finality for criminal law judgments to protect persons from the burden, expense, embarrassment, and harassment of multiple prosecutions and punishments for the same offense. . . . But the rule does not restrict Congress in defining separate offenses and prescribing punishments. . . . Moreover, its application has never been considered absolute. Rather, the prohibition against double jeopardy has regularly been applied to accommodate the government's interest in prosecuting persons who violate the law.

As noted earlier, however, after the change in the incorporation doctrine, and in the face of the criticisms and calls for reexamination of the dual sovereignty doctrine, the circuit courts have consistently continued to treat the dual sovereignty doctrine as valid. Angleton recognizes that this court is bound by *Abbate*, which held that a federal prosecution following a state prosecution was constitutional based on the dual sovereignty doctrine.

## 2. Changes in Commerce Clause Jurisprudence

Angleton also argues that recent changes in Commerce Clause jurisprudence indicate a willingness by the courts to reexamine the limits of Congress's Commerce Clause power. He asserts that section 1958, as applied in this case, crosses those limits, eliminating the independent federal interest in pursuing this prosecution. In *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Court, for the first time in almost six decades, invalidated a federal criminal law as exceeding the scope of the Commerce Clause. The Court summarized its interpretations of the Commerce Clause as establishing "three broad categories of activity that Congress may regulate under its commerce power ... Congress may regulate the use of the channels of interstate commerce ... Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities ... Congress [has] the power to regulate those activities having a substantial relation to interstate commerce ... *i.e.*, those activities that substantially affect interstate commerce." 514 U.S. at 558–559, 115 S.Ct. 1624. The statute at issue in *Lopez*, which made it a crime knowingly to possess a firearm in a school zone, did not fall within the first two categories. The Court analyzed the statute as a regulation of an activity affecting interstate commerce and found it unconstitutional because the statute "neither regulates a commercial activity nor contains a requirement that [the defendant's] possession of a firearm have been connected in any way to interstate commerce." *Id.* at 551, 115 S.Ct. 1624.

In *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), the Court held a provision of a federal statute providing a civil remedy to victims of gender-motivated crimes of violence unconstitutional as an invalid exercise of the third prong of the Commerce Clause power. *See id.* 120 S.Ct. at 1754. Neither the statute at issue in *Lopez* nor the provision involved in *Morrison* had a jurisdictional element establishing that the federal cause of action was in pursuance of Congress's power to regulate interstate commerce.

The Fifth Circuit has also recently reexamined the constitutionality of federal criminal statutes based on the regulation of activities affecting commerce. In a recent case, the Fifth Circuit, by an evenly-divided en banc vote, held that a conviction under the Hobbs Act for a series of fast food restaurant robberies was constitutional. *United States v. Hickman*, 179 F.3d 230 (5th Cir.1999), *affirming in relevant part*, 151 F.3d 446 (5th Cir.1998). The court has granted en banc rehearing on the issue. *United States v. McFarland*, 264 F.3d 557 (5th Cir.2001), *rehearing en banc granted*, 281 F.3d 506 (5th Cir.2002).

Unlike the statutes in *Lopez, Morrison,* or the Hobbs Act cases, section 1958 does not purport to regulate murder for hire because the activity affects interstate commerce. Rather, it is based on Congress's power to regulate either the channels of interstate commerce or the subjects of interstate commerce. The most recent case to test the continuing viability of statutes regulating the subjects of interstate com-

merce is *Reno v. Condon,* 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000). In *Condon,* the Court held the Driver's Privacy Protection Act constitutional under the Commerce Clause because the information it regulates is a "thing in interstate commerce." *Id.* Angleton argues that no recent Supreme Court case has tested whether a statute based on regulation of the channels of interstate commerce is constitutional when the use of those channels may be incidental to criminal activity and the criminal activity is not directed at commerce. However, in *Morrison,* the Supreme Court noted that another section of the statute created a federal criminal remedy to punish interstate crimes of abuse, including against spouses or intimate partners, during interstate travel, and crimes committed by spouses or intimate partners who crossed state lines to continue the abuse. *Morrison,* 529 U.S at 613, 120 S.Ct. 1740. The Court noted that the courts of appeals had uniformly upheld this criminal sanction as an "appropriate exercise of Congress' Commerce Clause authority, reasoning that '[t]he provision properly falls within the first of *Lopez's* categories as it regulates the use of channels of interstate commerce—*i.e.,* the use of the interstate transportation routes through which persons and goods move.' " *Id.* at 613 n. 5, 120 S.Ct. 1740 (quoting *United States v. Lankford,* 196 F.3d 563, 571–72 (5th Cir.1999)); *see also Jones v. United States,* 529 U.S. 848, 850–51, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000) (holding that "an owner-occupied private residence not used for any commercial purpose does not qualify as property 'used in' commerce or commerce-affecting activity" for purposes of the federal arson statute, 18 U.S.C. § 844(i)).

Section 1958 contains a jurisdictional element requiring travel in interstate commerce or use of a facility of interstate commerce. Its constitutionality is firmly established under existing Commerce Clause jurisprudence. *Morrison,* 529 U.S. at 613, 120 S.Ct. 1740; *United States v. Bailey,* 112 F.3d 758, 766 (4th Cir.1997) (upholding 18 U.S.C. § 2261(a) making it illegal to travel across a state line with the intent to injure, harass, or intimidate a spouse or intimate partner and intentionally commit a crime of violence against that person). Like the statutes upheld in these cases, the federal murder for hire statute requires interstate travel or use of interstate facilities, "thus placing the transaction squarely in interstate commerce." *Bailey,* 112 F.3d at 766; *Lankford,* 196 F.3d at 571–72.

Angleton argues that section 1958 as applied to this case raises serious questions regarding the outer limits of the Commerce Clause power because the link with interstate commerce is incidental to the alleged crime. Angleton points out that many of the successive federal prosecutions are cases involving civil rights violations, drug trafficking, or organized crime activities, in which the separate federal interest is clear. *Patterson,* 809 F.2d at 247; *Koon,* 34 F.3d at 1438; *Harrison,* 918 F.2d at 472. Angleton contends that the absence of any other federal interest, and the tenuous link to interstate commerce, make this prosecution improper.

Angleton's Commerce Clause arguments are foreclosed by Fifth Circuit precedent. The Fifth Circuit has recently confirmed the constitutionality of section 1958 in *United States v. Marek,* 238 F.3d 310 (5th Cir.2001) (en banc), interpreting the statute broadly to allow even intrastate use of a facility of interstate commerce to satisfy the jurisdictional element. In *Marek,* the court considered two murder for hire prosecutions, one of which involved international phone calls and the "hit-men" traveling from Mexico to Brownsville. The other case only involved intrastate transfers of money through Western Union. The court

analyzed the statutory language and determined that intrastate use of a facility of interstate commerce satisfied the statute and the Constitution. *Id.* at 315–22 (citing *Caminetti v. United States,* 242 U.S. 470, 491, 37 S.Ct. 192, 61 L.Ed. 442 (1917) ("[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses ... is no longer open to question.")); *see also United States v. Weathers,* 169 F.3d 336 (6th Cir. 1999) (use of cellular telephone satisfied jurisdictional element of section 1958).

Angleton urges that Congress's intent to limit section 1958 to cases involving significant federal interests is confirmed by the Department of Justice *Petite* Policy governing successive federal prosecutions. He argues that to allow a successive prosecution in this case under section 1958 is inconsistent with the legislative intent behind that statute and inconsistent with the *Petite* policy itself. Angleton asserts that this court should limit section 1958 by making it applicable only where there is a significant federal interest at stake—that is, by judicially implementing the *Petite* policy. (Docket Entry No. 38, at 35–38). However, the courts have consistently held that the *Petite* policy may not be enforced by a defendant against the government. *See Patterson,* 809 F.2d at 247 (citations omitted). The *Petite* policy is "not constitutionally mandated." *Rinaldi v. United States,* 434 U.S. 22, 28, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977) (per curiam). Angleton urges that the federal prosecutors be required to demonstrate a substantial federal interest to the court before this successive federal prosecution may proceed. Courts have consistently rejected imposing such a requirement. *See id.; United States v. Nelligan,* 573 F.2d 251, 255 (5th Cir.1978); *Basile,* 109 F.3d at 1308; *United States v. Schwartz,* 787 F.2d 257, 267 (7th Cir.1986); *United States v. Thomas,* 759 F.2d 659, 668 (8th Cir.1985); *United*

*States v. Catino,* 735 F.2d 718, 725 (2d Cir.1984).

In the one reported federal prosecution under section 1958 that followed a state murder prosecution, *United States v. Basile,* 109 F.3d 1304 (8th Cir.1997), the court considered, and rejected, a very similar argument. In *Basile,* the wife of one of the defendants was found shot to death. The husband and the man he allegedly paid to have his wife shot were both tried in state court. The husband was acquitted on state murder charges. The husband was subsequently indicted in federal court under section 1958, convicted, and sentenced to life in prison. On appeal, he argued double jeopardy, asserting, as Angleton argues here, that the federal prosecution was for an "unremarkable case of spousal murder" with "questionable" federal interest. *Id.,* 109 F.3d at 1307. The court disagreed, stating that:

> while contract killing, standing alone, may not be a federal crime, it may become such when its perpetration involves the use of the mail or facilities in interstate commerce. The independence and importance of the federal interest in protecting the channels of interstate commerce from the taint of crime is unaffected by [defendant's] previous acquittal in state court; it remains just as important and worthy of vindication after the state trial as it was before. "[T]he federal government had an interest, independent of any state interest, to ensure that an individual who is believed to have violated a federal statute is prosecuted for that violation."

*Id.* (citations omitted).

Like Angleton, the defendant in *Basile* argued the absence of a compelling federal interest justifying a successive federal prosecution under section 1958 in terms of a misapplication of the *Petite* policy. The *Basile* court stated:

We are not convinced that the federal prosecution in this case failed to meet the "compelling interests" requirement of the *Petite* policy. We need not and do not decide the question, however, because the *Petite* policy is "not constitutionally mandated," *Rinaldi*, 434 U.S. at 29, 98 S.Ct. at 85, and otherwise "confers no substantive rights on the accused," *United States v. Moore*, 822 F.2d 35, 38 (8th Cir.1987) (per curiam). Thus the DoJ's implementation of the policy "cannot form the basis of a claim [by a defendant] that the prosecution was improper." *United States v. Lester*, 992 F.2d 174, 176 (8th Cir.1993).

*Id.* A federal prosecutor may, in deciding to pursue a subsequent prosecution, "take into consideration what he deems is an 'inadequate result'" of the state proceedings. *United States v. Arena*, 180 F.3d 380 (2d Cir.1999) (citing *United States v. Ng*, 699 F.2d 63, 68 (2d Cir.1983)).

Angleton's argument that this court should avoid constitutional issues by requiring the government to show a compelling federal interest as a condition of prosecuting Angleton under the federal murder for hire statute is not a valid basis for dismissing this indictment.

## IV. The Findings as to Frivolousness

The final procedural issue raised in this case is whether this court will continue to have jurisdiction to try the case during the interlocutory appeal from the denial of Angleton's motion to dismiss. In *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), the Court held that the denial of a motion to dismiss an indictment on the basis of double jeopardy results in an appealable final order. The Court emphasized that the rights conferred under the Double Jeopardy Clause "would be significantly undermined if appellate review of double jeopardy claims were postponed until after conviction and sentence" because the Double Jeopardy

Clause is not only a protection against twice being convicted, but is also a "guarantee against being twice put to trial for the same offense." *Id.* at 660–61, 97 S.Ct. 2034.

> Because of this focus on the "risk" of conviction, the guarantee against double jeopardy assures an individual that, among other things, he will not be forced, with certain exceptions, to endure the personal strain, public embarrassment, and expense of a criminal trial more than once for the same offense. It thus protects interests wholly unrelated to the propriety of any subsequent conviction.

*Id.* at 662, 97 S.Ct. 2034. In a footnote, the Court noted that its holding "may encourage some defendants to engage in *dilatory* appeals." *Id.* at 662 n. 8, 97 S.Ct. 2034 (emphasis added). The Court noted, however, that such "problems of delay" could be ameliorated by expedited appeals and procedural rules issued under the courts' supervisory powers. *Id.*

In *United States v. Dunbar*, 611 F.2d 985, 987 (5th Cir.1980) (en banc), the Fifth Circuit put into place procedural rules for dual jurisdiction of trial and appellate courts during interlocutory appeals from orders denying motions to dismiss based on double jeopardy. These rules are designed to balance the need to review colorable double jeopardy claims before a successive trial that would in itself infringe the rights double jeopardy protects, against the risk of delay and disruption that would result from divesting the district court of jurisdiction to proceed any time a defendant takes an interlocutory appeal from a denial of a double jeopardy claim. The court recognized that "[s]ituations of this kind call for a rule which is both reflective of practical common sense and protective of the essence of the right of appeal recognized in *Abney*." *Id.* at

988. The court reasoned that "failure to review a colorable double jeopardy claim before trial creates a substantial risk that the accused's constitutional rights will be infringed." *Id.* However, this risk must be balanced against the "great potential for disruption" caused by dilatory appeals. The court held that:

> Henceforth, the district courts, in any denial of a double jeopardy motion, should make written findings determining whether the motion is frivolous or nonfrivolous. If the claim is frivolous, the filing of a notice of appeal by the defendant shall not divest the district court of jurisdiction over the case. If nonfrivolous, of course, the trial cannot proceed until a determination is made of the merits of an appeal.

*Id.* The Fifth Circuit emphasized that such written findings by the district court would permit expeditious appellate review of the issues presented. If the circuit court disagreed with the court's determination that the claim was frivolous, it could grant a stay or a writ of mandamus pending appeal. If the circuit court did not issue a stay, permitting the trial to proceed pending the appeal, then found the appeal meritorious, the conviction in the district court would be reversed. If the appeal was found not to have merit, jurisdiction for the trial that had occurred during the appeal would be affirmed. *Id.* at 989. Other circuit courts have followed this approach. *See, e.g., United States v. Millan,* 4 F.3d 1038, 1044 (2d Cir.1993); *United States v. Leppo,* 634 F.2d 101, 105 (3d Cir.1980); *United States v. Head,* 697 F.2d 1200, 1204 & nn. 3–5 (4th Cir.1982); *United States v. Grabinski,* 674 F.2d 677, 679 (8th Cir.1982) (en banc); *United States v. Bizzard,* 674 F.2d 1382, 1385 (11th Cir.1982); *United States v. Black,* 759 F.2d 71, 73 (D.C.Cir. 1985).

The government argues that this court must find Angleton's claims are frivolous because he has failed to establish a *prima facie* case of double jeopardy. (Docket Entry No. 51, at 3). Angleton responds that the government's argument improperly conflates the standard for determining a *prima facie* case of double jeopardy and the standard for a nonfrivolous or "colorable" claim of double jeopardy. Angleton argues that even if this court finds he has not made a *prima facie* case under existing law defining and applying the dual sovereignty doctrine, he has nonetheless made colorable, nonfrivolous arguments supporting a reexamination of that doctrine, as applied to the particular facts presented by this case. Angleton identifies four issues as "not insubstantial .... fairly debatable ... or of arguable merit factually and legally." (Docket Entry No. 79, at 3, *citing United States v. Becton,* 498 F.Supp. 1013, 1025 (S.D.Tex.1980)).

- "[I]n the era of the State/Federal task force, an issue of whether *Bartkus/Abbate* are still relevant (the broad question)";

- "[T]he question of whether, by the guise of regulating commerce among the States, the Federal Executive can re-litigate an issue of violation of a State Statute by adopting that statute into a derivative federal statute (a more narrow question)";

- "[T]he question of when the State/Federal task forces become sufficiently intertwined so that estoppel begins to bite"; and

- "[T]he question of whether the Courts need to adopt and enforce something similar to the ... *Petite* Policy."

(*Id.*). Angleton in effect urges that even if his arguments have little likelihood of success under current law, he has raised colorable challenges to the application of the law to the unusual facts of this case, inconsistent with a finding of frivolousness.

## A. The Frivolousness Standard under *Dunbar*

In *United States v. Dunbar*, 611 F.2d 985 (5th Cir.1980), the defendant had been convicted of conspiracy to possess a controlled substance with the intent to distribute. He had also been indicted for five counts of the substantive offense of distributing controlled substances. A few days before his trial on the substantive offenses was to begin, Dunbar moved to prevent the introduction of evidence used in the prior conspiracy trial, asserting double jeopardy. A panel of the Fifth Circuit held that the double jeopardy motion was "both frivolous and dilatory," and "totally devoid of merit," but that the interlocutory appeal from the denial of the double jeopardy claim divested the district court of jurisdiction to proceed with the trial. The Fifth Circuit reversed, en banc, holding that a district court denying a double jeopardy motion must make a finding as to whether the motion is frivolous or nonfrivolous. If frivolous, the district court would continue to have jurisdiction pending the appeal. If nonfrivolous, the trial could not proceed until the merits of the appeal were determined. 611 F.2d at 988. The Fifth Circuit noted that "district courts are not strangers to making a determination of whether matters are frivolous," citing as examples the determination whether to deny bail because an appeal is frivolous under 18 U.S.C. § 3148, and the determination whether to deny leave to proceed *in forma pauperis* to file a frivolous appeal under 28 U.S.C. § 1915(a). The court observed that the frivolousness determination was already part of the jeopardy analysis: "[i]ndeed, in considering a double jeopardy motion, the district court must determine whether a defendant has tendered a *prima facie* nonfrivolous double jeopardy claim before shifting the burden of persuasion to the Government." *Id.* (citing *Stricklin*, 591 F.2d at 1117–18).

In *United States v. Kalish*, 690 F.2d 1144, 1147 (1982), the Fifth Circuit reversed a district court's denial of a double jeopardy plea as to the conspiracy counts of an indictment, while affirming the conviction on the substantive counts. The double jeopardy issue turned on whether the defendant carried out his alleged narcotics transactions as a member of one or more conspiracies. The Fifth Circuit held that the defendant had made a *prima facie*, nonfrivolous claim that the indictments charged the same conspiracy and that the government had failed to meet its burden of showing that the indictments charged different conspiracies. The court noted that its "function on appeal is not to review the district court's finding of frivolousness," but rather to determine whether the claim has actual merit. However, the appellate court criticized the district court for finding frivolousness. In *Dunbar*, the double jeopardy argument "was a purely legal one which was foreclosed by numerous decisions of the Supreme Court and of this court." 690 F.2d at 1154. In *Kalish*, by contrast, the double jeopardy claim was complicated and fact-ridden: did the defendant conduct his drug activities as part of one conspiracy or different conspiracies? The Fifth Circuit concluded that it was "mystified" by the district court's characterization of this issue as "frivolous." *Id.* The Fifth Circuit cautioned that

> district courts must adhere to the literal meaning of the term "frivolous".... The whole purpose of *Abney* is defeated when district courts proceed to trial because they do not believe the defendant's double jeopardy plea is sufficiently meritorious to warrant a stay. *Dunbar* was intended to prevent dilatory claims, not colorable ones.

*Id.*

Other courts have held that double jeopardy claims are not frivolous when the claim is complicated or raises legal issues

not clearly foreclosed by binding precedent, even if the claim is rejected on the merits. In *United States v. Aguilera*, 179 F.3d 604 (8th Cir.1999), for example, the Eighth Circuit considered a case in which the district court denied a motion to dismiss based on double jeopardy, but failed to make a finding as to frivolousness. The court held that the double jeopardy claim was not frivolous because the district court held a hearing and considered more than just the indictments. *See also United States v. Kress*, 58 F.3d 370 (8th Cir.1995) (double jeopardy claim not frivolous considering the depth of the district court's analysis, notwithstanding that the Eighth Circuit found the claim unsuccessful); *United States v. McHan*, 966 F.2d 134 (4th Cir.1992) (double jeopardy claim asserted to bar indictment for drug conspiracy and continuing criminal enterprise based on prior guilty plea to drug conspiracy in same period was not frivolous, because determining whether the indictments charged the same offense required complex analysis of facts to determine whether predicate offense was lesser included offense of multilayered crime, even though appellate court found the jeopardy claim without merit); *United States v. Wood*, 950 F.2d 638 (10th Cir.1991) (double jeopardy claim following district court's grant of new trial following jury's exposure to extraneous material during deliberations was colorable because facts were sufficiently distinguishable from Supreme Court precedent to escape characterization as frivolous). Echoing the Fifth Circuit's description of the nature of the double jeopardy claim in *Dunbar*, the Ninth Circuit has stated that purely legal claims are frivolous when the outcome is "clear" upon "long-standing case law" binding in that circuit. *United States v. LaMere*, 951 F.2d 1106 (9th Cir.1991).

The Supreme Court has also discussed, in *dicta*, when a double jeopardy claim is appealable under *Abney*. In *Richardson v. United States*, 468 U.S. 317, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984), the Court considered a claim that a mistrial based on insufficiency of the evidence barred a retrial. The Court held that the Double Jeopardy Clause did not bar retrial. The Court found, however, that the defendant has raised a "colorable" claim, appealable under *Abney*. *Id.* at 322, 97 S.Ct. 2034. In a footnote, the Court advised that in the future, similar claims would no longer be "colorable" because the Court had issued a conclusive ruling on the issue. The Court stated: "[a] colorable claim, of course, presupposes that there is *some possible validity* to a claim. Since no set of facts will support the assertion of a claim of double jeopardy like petitioner's in the future, there is no possibility that a defendant's double jeopardy rights will be violated by a new trial...." *Id.* at 326 n. 6, 97 S.Ct. 2034 (emphasis added).

This court applies these standards to Angleton's double jeopardy claims.

**B. Analysis**

█ The threshold question is whether this court's finding that Angleton failed to make a *prima facie* showing of double jeopardy precludes a finding that he has raised any nonfrivolous issues on appeal. The government's argument is supported by the language in *Dunbar* emphasizing the relationship between the district court's determination under *Stricklin* that the defendant has tendered a *prima facie* nonfrivolous double jeopardy claim before shifting the burden of persuasion to the government, and the district court's determination that the claim was frivolous under *Abney*. However, this observation does not end the analysis.

Neither *Dunbar* nor *Stricklin* involved successive prosecutions under the dual sovereignty doctrine. In those cases, the defendant had the burden of making a nonfrivolous *prima facie* showing that the

indictments charged the same offenses. This court has found that Angleton did make a *prima facie* showing under *Blockburger* that the state and federal indictments charged the same offenses, but that the government then met its burden of showing different offenses in the two indictments by virtue of the dual sovereignty doctrine. As to this threshold showing, this court's denial of the double jeopardy motion does not preclude a finding that Angleton's argument is nonfrivolous.

Angleton then argued that under *Bartkus* and its progeny, the degree of state involvement in this federal prosecution makes it, in effect, a state prosecution and a sham. This court has found that Angleton failed to make a *prima facie* nonfrivolous showing of collusion sufficient to trigger the *Bartkus* exception. *See Harrison,* 918 F.2d at 475; *Patterson,* 809 F.2d at 247. *Bartkus* itself involved such extensive involvement by the first sovereign in the second sovereign's prosecution as to make the standard for a *prima facie* showing of collusion extraordinarily high. The Fifth Circuit cases involving *Bartkus* are few in number and not fully on point. However, the cases from the Fifth Circuit, as well as other circuits, make it clear that Angleton's double jeopardy claim based on the *Bartkus* exception is precluded by current law. *See Harrison,* 918 F.2d 469; *Whalers Cove,* 954 F.2d at 38 (suggesting that one sovereign "must have effectively manipulated the actions of the [other sovereign] so that [its] officials retained little or no independent volition."); *Guzman,* 85 F.3d at 827 (exception limited to situations in which one sovereign "thoroughly dominates or manipulates the prosecutorial machinery of another"); *accord Rashed,* 234 F.3d at 1283; *Baptista–Rodriguez,* 17 F.3d at 1361; *Kunstler,* 914 F.2d at 517; *Liddy,* 542 F.2d at 79. This court concludes that Angleton's double jeopardy claim based on

the degree of involvement by the state authorities in the federal prosecution, the *Bartkus* exception, is frivolous.

Angleton's double jeopardy claim based on his argument that because the federal indictment incorporates and derivatively enforces that state statute, the dual sovereignty doctrine does not apply, is a purely legal argument. It is based on a comparison of the elements of the federal murder for hire statute and the elements of the state statute that it "incorporated," different from the *Blockburger* test at issue in *Stricklin* and from the *Bartkus* sham prosecution exception. This court found Angleton's argument unpersuasive on several grounds, including that the relationship of the state and federal statutes in *Houston v. Moore* was far closer than the relationship of the state and federal statutes at issue here. However, only one reported circuit court case, *United States v. Basile,* 109 F.3d 1304 (8th Cir.1997), has considered a double jeopardy challenge to a successive prosecution under the federal murder for hire statute following a state prosecution for capital murder. There is no indication that the defendants in *Basile* raised the argument that the incorporation of the state statute into the federal law precluded the successive prosecution by the federal government. This claim is not frivolous under *Dunbar* and related cases; it is a purely legal argument, but it is not addressed or specifically foreclosed by decisions of the Supreme Court or this circuit.

Angleton's claim that the Double Jeopardy Clause and the Commerce Clause are strained beyond constitutional limits if applied to this successive federal murder for hire prosecution following the state capital murder acquittal is, at bottom, an argument that the dual sovereignty doctrine should be modified or limited.[30] Angleton emphasizes changes that have occurred

---

**30.** To the extent Angleton's Commerce Clause

argument seeks a determination by this court

since *Bartkus* and *Abbate* were decided—the increasing federalization of federal criminal law and the Supreme Court's narrowing of the permissible use of the Commerce Clause—to support his arguments for reexamining and limiting the dual sovereignty doctrine, at least as applied to the unusual facts presented here. His arguments raise an issue unaddressed in cases involving appeals under *Abney:* is an argument for a modification of the existing law of double jeopardy, at least as applied to the unusual facts of a particular case, by definition and without exception frivolous?

Angleton is far from the first to argue that some of the assumptions on which *Lanza, Bartkus, Abbate,* and their progeny rest have changed, based on the fact that *Lanza, Bartkus,* and *Abbate* were all decided by closely divided Courts and that the Supreme Court has not specifically addressed the federalism aspects of the dual sovereignty doctrine since 1959, which was before the Court recognized that the Double Jeopardy Clause applies to the states, before the vast increase in federal criminal law, and before the Court recognized limits to the Commerce Clause. *See, e.g., GPS Automotive,* 66 F.3d at 497–99 (Calabresi, J., concurring) (urging reexamination of the dual sovereignty doctrine). On the other hand, circuit courts have repeatedly, consistently, and recently rejected arguments very similar to those Angleton makes as grounds for questioning or limiting the dual sovereignty doctrine. *See Figueroa–Soto,* 938 F.2d at 1018 (after *Benton v. Maryland,* "nothing in this ex-tension of the Constitution changed the *Lanza* rule. The proposition that the state and federal governments may punish the same conduct has been reaffirmed."); *Tirrell,* 120 F.3d at 676 ("although the doctrine has received some judicial and scholarly criticism over the years," it has remained binding); *Basile,* 109 F.3d at 1307 (in a successive federal prosecution under section 1958 following a state trial for contract murder of spouse of one of the defendants, court rejected argument that it should revisit the dual sovereignty doctrine and the rule that a court cannot enforce the *Petite* policy by insisting that the prosecution serve compelling federal interests).

In *Dunbar,* the court admonished district courts to examine other contexts in which findings are made as to frivolousness as a guide to its application in an *Abney* appeal. In *Kalish,* the court admonished district courts to adhere to the literal meaning of the term "frivolous," emphasizing that the *Dunbar* procedure was intended to prevent dilatory claims, not colorable ones. A brief examination of the term "frivolous" in these other contexts is instructive. In the context of determining whether arguments are frivolous for the purpose of imposing sanctions, courts examine whether "they are warranted by existing law or any plausible good faith argument for the extension, modification or reversal of existing law." *Reed v. Commercial State Bank of El Campo,* 861 F.2d 1381, 1383 (5th Cir.1988); Fed.R.Civ.Pro. 11(b)(2).[31] The frivolous

---

that section 1958 is unconstitutional, that argument is clearly foreclosed and is not an argument based on double jeopardy. As the Fourth Circuit noted in *Head,* 697 F.2d at 1204–05, a claim is frivolous under *Abney* when it is "advanced as one of 'double jeopardy' [but] is manifestly not that in substantive content." Angleton's claim that section 1958 is unconstitutional is not a double jeopardy claim and is frivolous.

**31.** The 1993 Advisory Committee Notes to Rule 11 state that "arguments for extensions, modifications, or reversals of existing law or for creation of new law do not violate [Rule 11] provided they are 'nonfrivolous.' ... the extent to which a litigant has researched the issues and found some support for its theories even in minority opinions, in law review articles, or through consultation with other attorneys should certainly be taken into account...."

standard used in 18 U.S.C. § 1348 to determine whether to grant bail pending appeal provided, at the time *Dunbar* was decided, that "[a] person ... who has been convicted of an offense and ... has filed an appeal ... shall be treated in accordance with the provisions of [18 U.S.C. § 3146] unless ... it appears that an appeal is frivolous or taken for delay...."[32] *Dunbar* also referred to the frivolousness determination made in connection with requests for leave to appeal in *forma pauperis* under 28 U.S.C. § 1915(a), citing *Coppedge v. United States*, 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Section 1915(a) provides that "[a]n appeal may not be taken in *forma pauperis* if the trial court certifies in writing that it is not taken in good faith." 28 U.S.C. § 1915(a). In *Coppedge*, the Supreme Court interpreted this provision as applied to a criminal appeal. 369 U.S. at 443, 82 S.Ct. 917. The Court held that "a defendant's good faith in [a criminal] case [is] demonstrated when he seeks appellate review of any issue not frivolous." *Id.* at 445, 82 S.Ct. 917. The Court explained:

> It is not the burden of the petitioner to show that his appeal has merit, in the sense that he is bound, or even likely, to prevail ultimately. He is to be heard, as is any appellant in a criminal case, if he makes a rational argument on the law or facts.

*Id.* at 447–48, 82 S.Ct. 917. *See also Richardson v. Spurlock*, 260 F.3d 495, 498 (5th Cir.2001) ("stating that a complaint is frivolous if it lacks an arguable basis in law or fact; a complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.").

Angleton acknowledges that many of his arguments challenge the application of existing case law. He urges the modification of long-standing precedent as applied to a case in which the indictment in the successive prosecution alleges a violation of a federal statute that incorporates and derivatively enforces the state law that was the subject of the prior state acquittal, and the federal basis for prosecution is created through the incidental use of interstate travel and facilities of interstate commerce. This court holds that under existing precedent, Angleton's double jeopardy claim is without merit. However, Angleton's argument for modifying and narrowing the dual sovereignty doctrine as applied to the facts disclosed on this record is not frivolous; it may well fail, but is not frivolously asserted.

Angleton did not wait until the eve of trial to assert a double jeopardy claim. There is no suggestion that he has asserted this claim solely for the purpose of delaying this second trial. While there is always delay and disruption attendant to an interlocutory appeal that stays the trial pending the outcome, that delay is relatively small in this case, as compared to the three and one-half years that elapsed between Angleton's state trial and the issuance of the federal indictment. This court finds that Angleton's argument for modification and limitation of the dual sovereignty doctrine in a case in which the federal statute under which the defendant is prosecuted incorporates the state statute under which that defendant was previously acquitted is not frivolous.

## V. Conclusion

This court DENIES Angleton's motion to dismiss based on the Double Jeopardy

---

**32.** The standard under 18 U.S.C. § 1348 was replaced by a stricter standard in the Bail Reform Act of 1984. *See United States v.*

*Valera–Elizondo*, 761 F.2d 1020, 1023 (5th Cir.1985).

Clause and enters the findings as to frivolousness as stated above.